In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-4019, 99-4074, 99-4279, 99-4280,
99-4281, 99-4283 & 99-4296

United States of America,

Plaintiff-Appellee,

v.
Anthony Thompson, Stephanie Johnson,
Anthony D. Spradley, et al.,

Defendants-Appellees.

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP-98-38-CR-01-13-M/F--Larry J. McKinney, Chief Judge.

Argued June 4, 2001--Decided April 9, 2002

Before Ripple, Evans, and Williams, Circuit
Judges.

Williams, Circuit Judge.  In this case,
we are presented with former participants
in a drug conspiracy who raise a myriad
of challenges to their convictions and
sentences. We affirm in all respects
except we remand for the resentencing of
two defendants because the district court
erred by applying U.S.S.G. sec.
2D1.1(d)(1), the drug offense murder
cross reference, to their sentences. We
also, in affirming the district court,
adopt the Tenth Circuit's view of waiver,
see United States v. Cherry, 217 F.3d 811
(10th Cir. 2000), and approve the
admission of the testimony of a murdered
co-conspirator when the murder was
reasonably foreseeable to other
conspirators.

I.  BACKGROUND

Defendants Willie Boddie, Stephanie
Johnson, Dennis Jones, Anthony Spradley,
Anthony Thompson, Ellis Walker, and Mark
White were charged with crimes arising
out of their participation in a large,
Indianapolis-based drug conspiracy. The
conspiracy reigned from 1992 to 1997 and
involved the trafficking of hundreds of
kilograms (kilos) of cocaine, the
accumulation and laundering of

substantial profits, and two short-lived business pursuits. The conspiracy seemed invincible until November 1996, when Marcus Willis, working on behalf of law-enforcement officials, arrived on the scene. He worked for law enforcement for approximately eight months (through June of 1997) until he was murdered in one of the defendant's vehicles. Not long after his murder, charges were filed against each of the defendants and several others not part of this appeal.

Count 1 of the indictment charged each defendant with conspiracy to distribute more than five kilograms of cocaine (21 U.S.C. sec. 846). Counts 2-3 charged defendants Spradley and White with murder of an informant (18 U.S.C. sec. 1512(a)(1)(C)), and counts 5-6 charged Jones with assisting in that murder (18 U.S.C. sec.sec. 1512(a)(1)(B), (C)) and (18 U.S.C. sec.sec. 1111(a), 1113). Johnson was charged under counts 8, 9, 16, and 17 for substantive money laundering and conspiracy to launder./1

At trial, the government relied heavily on the testimony of several coconspirators who agreed to cooperate with the government in exchange for leniency. There was little physical evidence of the drug conspiracy, but the testimonial evidence, for the most part, was overwhelming, and the jury convicted all the defendants, except Johnson, of drug conspiracy. As to the Marcus Willis murder, the alleged eye-witnesses, unindicted coconspirator William Cox and defendant Mark White, could not agree on who actually murdered Willis and neither of their stories could be corroborated. We assume that this inconsistency led the jury to acquit Spradley, Jones, and White of the murder-related charges. Finally, as to Johnson's money laundering charges, the government presented evidence that she allowed several defendants to purchase vehicles, homes, and motorcycles in her name to conceal the identity of the true owners and the illegal source of the purchase funds. Based on this evidence, the jury convicted her of substantive money laundering and conspiracy to launder.

The district court sentenced Spradley, Boddie, Jones, and White to life imprisonment on the drug conspiracy count pursuant to sec. 2D1.1 of the Sentencing

Guidelines after concluding that the conspiracy trafficked in more than five kilos of cocaine and that the sec. 2D1.1(d)(1) murder cross reference was applicable to Spradley, Jones, and White. These same defendants, including Boddie, were also sentenced to 20 years' imprisonment for their money laundering counts--to run consecutive to their life terms. Walker was sentenced to 327 months and Thompson to 210 months on the drug conspiracy count. Johnson was sentenced to four 59-month sentences for the money laundering convictions, to be served concurrently. The defendants now appeal their convictions and sentences on a number of grounds.

II.  ANALYSIS

A. Murder Cross Reference (U.S.S.G. sec.2D1.1(d)(1))

Spradley, Jones, and White challenge the district court's application of the drug offense murder cross reference, sec. 2D1.1(d)(1). This cross reference directs judges to apply the First-Degree Murder Guideline, sec.2A1.1, if the defendant's relevant conduct includes the killing of a victim under circumstances that would constitute premeditated murder as defined by 18 U.S.C. sec. 1111. United States v. Meyer, 157 F.3d 1067, 1073 (7th Cir. 1998). The defendants do not challenge the district court's factual findings, but argue that its findings are insufficient to support the application of the cross reference. Reviewing their challenges de novo, see United States v. Hunt, 272 F.3d 488, 496 (7th Cir. 2001), we agree that the findings are insufficient as to Jones and White, but disagree as to Spradley.

1. The cover-up

As the defendants state in their opening brief, "[t]he district court's findings of fact relevant to the death [of Marcus Willis] represent a meticulous and objective assessment of the facts as the court found them." So we quote a large portion of the findings here rather than rewriting them.

The evidence is that Marcus Willis was found fatally shot in the late evening or early morning hours of

Friday/Saturday June 27/28, 1997. Dennis Jones was arrested while driving a Yukon automobile into the parking lot at Mobile Jamzz on Key stone Avenue in Indianapolis on Monday, June 30, 1997. The operator of Mobile Jamzz was contacted by a person identified as Demarco to arrange for an appointment for repair. The call was made on Saturday morning, June 28, 1997. The repair was scheduled for Monday, June 30, 1997. That Yukon was the . . . same Yukon which White had been seen operating on many occasions and was generally identified as White's vehicle. Forensic evidence was presented establishing that the blood of Marcus Willis was present in that vehicle. At the time of Jones' arrest, the front passenger seat had been removed, the carpet on the passenger side had been cut out, and there was damage to the left side of the front windshield of the vehicle . . . .

The evidence also reveals that some of the remains of a left front seat used in Yukon automobiles of the same year and model as this one, and some seat belt parts were found by police later in a fire pit in the back yard at [coconspirator's] Dwayne Gibson's detail garage on Caroline [Street]. Carpet knives, along with the boxes in which they were purchased, were found by police in the garage. Car pet samples from the Yukon carpet were found on the knives. Glass fragments consistent with the windshield glass of the Yukon were found on the floor of the Caroline garage. Blood samples were obtained from the overhead door at Caroline and from the floor of the garage. These samples were matched with Marcus Willis' blood. Gibson later led law enforcement to the place where he had tossed the floor mats from the Yukon. The blood of Marcus Willis was found on those mats. . . . .

The district court then stated that this physical evidence was consistent with Keith Cork's and Gibson's trial testimony about the attempted coverup of the murder. Among other things, both testified that Spradley orchestrated the

coverup, directed Jones to drive the Yukon, and Gibson to follow Jones to Mobile Jamzz. They further testified that, as Jones was being apprehended by police in Mobile Jamzz's parking lot, Gibson fled to another location and called Spradley to alert him of the arrest.

The court chose not to credit Jones's testimony as to what occurred before his arrest on the morning of June 30, in part because it could not be corroborated. Jones testified that he was with Stephanie Johnson in a hotel room that morning and that Gibson paged him between 9:00 and 10:00 a.m., after which Johnson took him to meet Gibson. He further testified that Gibson gave him $20.00 to drive the Yukon to Mobile Jamzz. Johnson, however, told police that she had not been with Jones that morning and produced an employment record showing that she clocked into work that day at 8:30 a.m.

Based on this evidence, the district court concluded that Willis was murdered in White's Yukon, and that Spradley and Jones, among others, tried to cover up the murder.

2. Application of the murder cross reference

The district court inferred from Spradley's, Jones's, and White's participation in the cover-up that they knew Willis had been murdered by someone as a result of his informant activities, which threatened to expose the conspiracy. The attempt to cover up the murder, the district court concluded, was done in furtherance of the goals of the conspiracy and in an attempt to avoid detection. Because relevant conduct includes any action "that . . . occurred . . . in the course of attempting to avoid detection or responsibility for that offense," see U.S.S.G. sec.1B1.3(a)(1), the court thought the sec.2D1.1(d)(1) murder cross reference should be applied to each of these defendants./2

According to these defendants, the district court's findings are insufficient to support application of the cross reference. The Guidelines define relevant conduct as activities that occurred "in the course of

attempting to avoid detection or responsibility for [the] offense [of conviction]." U.S.S.G. sec. 1B1.3(a)(1)(B). Therefore, they argue, it was inappropriate for the district court to base its application of the cross reference on their cover-up activities because their offense of conviction is a drug-trafficking conspiracy, not murder./3

We disagree with the defendants' characterization of the district court's ruling. A fair reading of the court's order makes clear that it found that the cover-up activities were committed at least in part to avoid detection of the conspiracy. For example, the district court links the defendants' cover-up activities to the conspiracy when rejecting Spradley's objection to the Guideline application: "Spradley's role in the clean-up and his knowledge that Willis was giving evidence to the police support the inference that Spradley was aware that Willis had been murdered in an attempt to keep Willis from doing any further damage to the cocaine conspiracy." Similar language is used regarding defendants Jones and White. Therefore we believe that the district court did not treat the murder as the defendants' offense of conviction.

However, the defendants' argument highlights another potential problem with the district court's ruling--the possibility that section 2A1.1's premeditation requirement (see U.S.S.G. sec. 2A1.1, cmt. n. 1) may have been lost in the application of the several Guideline provisions at play here. We remanded a case recently because a district court failed to make a specific finding of premeditation. In that case, United States v. Thomas, 280 F.3d 1149 (7th Cir. 2002), the district court applied the First-Degree Murder Guideline to a defendant convicted of firearm-related convictions. Several facts relied upon by the district court seemed to connect the defendant (Thomas) to the murder of Armando Leal: Thomas was arrested while driving Leal's vehicle; Leal was likely murdered in that vehicle; Thomas pawned a pistol owned by Leal; and Leal's blood was found in Thomas's driveway. But the district court did not discuss how these facts showed that Thomas murdered Leal with malice

aforethought. Id. at 1158. The inference of premeditation was not the only one that could be drawn from those facts (for example, Thomas could have driven away in Leal's car after Leal had been murdered by someone else) so we remanded for the district court to make a specific finding of premeditation. Id. at 1156-57.

Here, the district court found that Spradley, Jones, and White knew of the murder and that it was committed in furtherance of the conspiracy. In so doing, the court apparently invoked Guideline sec.1B1.3(a)(1)(B), which holdsdefendants accountable at sentencing for the reasonably foreseeable relevant conduct of their coconspirators as long as the conduct was done in furtherance of the conspiracy. Because this additional Guideline is in play, the question we are presented with is slightly different than that presented in Thomas. The question here is whether it was reasonably foreseeable to Spradley, Jones, and White that Willis could be killed, with malice aforethought (premeditation), in furtherance of the conspiracy. See U.S.S.G. sec. 1B1.3(a)(1); sec. 2A1.1. After thoroughly reviewing the court's ruling, we believe that it made findings sufficient to support application of the First-Degree Murder Guideline to Spradley, but not to Jones or White. We now focus our discussion on whether Willis's murder was reasonably foreseeable to each defendant.

  a. Spradley

The district court found that Spradley knew Willis had been murdered to keep him from relaying any more information to law-enforcement authorities. It based its findings, in part, on evidence that Spradley knew about Willis's informant activities. Coconspirator Keith Cork testified at trial that several days before Willis's murder, he and Spradley confronted Willis about rumors that he had been talking to the police. Cork's testimony was corroborated by a statement to the same effect made by Willis to police on June 20, 1997, approximately ten days before the murder. In addition, Cork testified that Spradley, in a meeting about Willis's informant activities attended by several conspiracy members, said that he would not let

anyone hurt them.

We believe that this evidence sufficiently supports the conclusion that it was reasonably foreseeable to Spradley that Willis would be murdered with malice aforethought. Spradley knew that Willis was likely to be murdered in an attempt to prevent him from further exposing the conspiracy, which satisfies the test of reasonable foreseeability. Therefore the district court did not err by applying the First-Degree Murder Guideline to Spradley. See United States v. Walker, 142 F.3d 103, 114 (2d Cir. 1998).

### b. Jones

We have more difficulty concluding that the Guideline was properly applied to Jones. We do not think the fact that Jones lied to the police about his whereabouts on the morning of June 30th and his participation in the cover-up, taken together, are sufficient to support the inference that it was reasonably foreseeable to him that Willis would be murdered with malice aforethought. These facts tell us nothing about whether Jones had reason to know that someone in the conspiracy was likely to murder an informant.

"Reasonable foreseeability is the divining rod of the relevant conduct sentencing provision," United States v. DePriest, 6 F.3d 1201, 1212 (7th Cir. 1993) (internal citation omitted), therefore, "the burden of proving foreseeability under the circumstances of each individual case [rests] squarely on the government." United States v. Sandoval-Curiel, 50 F.3d 1389, 1393 (7th Cir. 1995). Here, the government has not met its burden. We have been willing to assume that carrying of weapons is foreseeable to most drug conspiracy members, in light of the violent nature of the drug business. See, e.g., id. But even with this presumption of violence, we still require the government to prove that the conspiracy's actions were foreseeable to each defendant to whom it seeks to impute relevant conduct. See id.

The government attempted to prove foreseeability by introducing evidence of conspiratorial violence, which we discuss in more detail later. The government's

evidence of random, non-fatal acts was not sufficient to meet its burden of proving foreseeability. Only one act the government points to actually resulted in an injury, and there was no evidence that this conspiracy had previously involved the murder or attempted murder of informants (or anyone else for that matter). This is simply not enough evidence. Without some better indication that Jones had reason to know that the conspiracy was likely to kill informants, we have no basis for concluding that the premeditated murder of Willis was reasonably foreseeable to him. Cf. United States v. Diaz, 176 F.3d 52, 99-100 (2d Cir. 1999) (holding the murder of a bystander in the commission of attempted murder of another was reasonably foreseeable because the conspirators had agreed to the attempted murder); United States v. Brooks, 957 F.2d 1138, 1149 (4th Cir. 1992) (holding the use of firearm was foreseeable to conspirator who himself had been threatened at gunpoint by other conspirators around the time gun was used). Therefore, we believe the district court erred by applying the First-Degree Murder Guideline to Jones.

However, we do not think it necessary to remand for the district court to make additional findings. The court has already recognized in its order that "there is no evidence that this conspiracy had [ ] ever engaged in murder." Accordingly, we vacate the district court's imposition of a life sentence to Jones based on the application of the First-Degree Murder Guideline and remand for the recalculation of his sentence.

  c. White

  For similar reasons, we believe that the district court erred by applying the First-Degree Murder Guideline to White. The court based its application of the Guideline to White on the fact that he lied about his whereabouts on the morning of/after the murder and that he participated in the cover-up./4 From these two facts, it concluded that White knew that Willis had been murdered in White's sports utility vehicle and that the murder was committed in furtherance of the conspiracy. As our analysis of Jones's challenge suggests, these facts

are insufficient. The fact that White knew that Willis had been murdered does not tell us whether the murder was reasonably foreseeable to him. And it certainly does not tell us whether it was reasonably foreseeable to him that Willis would be murdered with malice aforethought. There is also no indication that the conspiracy had previously engaged in murder or attempted murder. We need more of an explanation to judge whether the inference can be made from these facts that Willis's premeditated murder was reasonably foreseeable to White, but as is the case with Jones, we think that a remand for additional findings is unnecessary. Instead, we remand for resentencing consistent with our ruling.

B. Hearsay Statements

Pursuant to Federal Rule of Evidence 804(b)(6), the government sought to admit several hearsay statements made by murdered informant Marcus Willis. Rule 804(b)(6) exempts from the hearsay ban statements made by a declarant whose unavailability the defendant directly or indirectly procured. The government alleged before the district court that some of the defendants (Spradley, White, Boddie, Jones, and Walker) affirmatively participated in Willis's murder or its cover-up. Based on the government's proffer, the district court admitted the hearsay statements against these defendants. The government then argued that the actions of Spradley, White, Boddie, Jones, and Walker should also permit application of Rule 804(b)(6) to the remaining defendants because Willis's murder was within the scope and committed in furtherance of the drug conspiracy, and was reasonably foreseeable to each of the conspirators. Drawing on the coconspirator liability rationale first espoused in Pinkerton v. United States, 328 U.S. 640 (1946), the district court admitted the hearsay statements against those defendants that did not affirmatively participate in the murder or its cover-up.

Both groups of defendants challenge the admission into evidence of Willis's statements. Those defendants alleged by the government to have participated in Willis's murder or its cover-up argue that the district court misapplied Rule

804(b)(6) and violated their confrontation rights pursuant to the Sixth Amendment. Reviewing their Rule 804(b)(6) challenge for abuse of discretion, see United States v. Hunt, 272 F.3d 488, 494 (7th Cir. 2001), and Confrontation Clause challenge de novo, United States v. Ochoa, 229 F.3d 631, 637 (7th Cir. 2000), we conclude that any error made by the district court was harmless. The second group of defendants, those who did not affirmatively participate in the murder or cover-up, argue that the district court erred by admitting the statements against them based on an extension of Pinkerton. Employing the same standards of review, we reject their challenges as well.

1. Waiver of hearsay and confrontation clause objections

A defendant may waive his right to object on hearsay and Confrontation Clause grounds to the admission of out-of-court statements made by a declarant whose unavailability he intentionally procured./5 United States v. Dhinsa, 243 F.3d 635, 653 (2d Cir. 2001); Ochoa, 229 F.3d at 639; Fed. R. Evid. 804(b)(6) (exempting from the prohibition against hearsay "statements offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness"). The primary reasoning behind this rule is obvious--to deter criminals from intimidating or "taking care of" potential witnesses against them. But the rule is also grounded in principles of equity. See United States v. White, 116 F.3d 903, 911 (D.C. Cir. 1997) ("The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross-examine him."); see also Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 139 (1972), cited in United States v. Carlson, 547 F.2d 1346, 1359 (8th Cir. 1976); United States v. Mayes, 512 F.2d 637, 650 (6th Cir. 1975). Admission of the witness's statements at least partially offsets the benefit the defendant obtained by his misconduct. See White, 116 F.3d at 911.

a. Spradley, Jones, White, Boddie, and Walker

Spradley, Jones, White, Boddie, and Walker argue that the district court erred by concluding that their participation in the cover-up of Willis's murder amounted to waiver. Their arguments here are similar to their objections to the application of the First-Degree Murder Guideline. For example, they argue that their intent to procure Willis's unavailability cannot be inferred from their participation in the cover-up of the murder.

While our analysis of the First-Degree Murder Guideline might suggest that the district court erred in its admission of Willis's hearsay statements against these defendants, we will not disturb their convictions if admission of the hearsay statements was harmless error. Ochoa, 229 F.3d at 639-40. Harmless errors are those errors that did not contribute to the verdict. Hunt, 272 F.3d at 496. Based on our review of the trial record, we conclude that the admission of Willis's statements falls within this category of errors. We reach this conclusion because the government presented overwhelming evidence of the defendants' guilt; Willis's statements were not very important to the government's case; and, to the extent the statements were important, they were cumulative. See Hunt, 272 F.3d at 496 (listing these and other concerns as part of the harmless error analysis).

The government's case against each of the defendants was overwhelming. The government obtained the cooperation of several conspirators who provided highly incriminating testimony. Keith Cork, for example, testified that the conspiracy trafficked in more than 500 kilograms of cocaine. As Spradley's assistant, he was familiar with the drug activities of each of the defendants. His testimony detailed the inner-workings of the conspiracy and the defendants' roles within it. Other cooperating witnesses, Robert Johnson, for example, also testified as to the depth and breadth of the conspiracy's drug activities and of his personal interaction with the defendants as a mid-level dealer in the organization. In addition, evidence of the many numerous expensive cars that conspiracy members

purchased in Stephanie Johnson's and other individuals' names was introduced at trial. There was evidence that large amounts of cash (over $350,000 dollars) had been seized from Spradley, Jones, and others during the pendency of the conspiracy--cash that was never reclaimed. Taken together, these facts are more than sufficient to support the jury's verdict. See United States v. Brown, 934 F.2d 886, 890 (7th Cir. 1991).

Given this overwhelming evidence, it is highly unlikely that Willis's marginally inculpating statements had any impact on the jury's findings. Willis's statements described uncompleted drug transactions, detailed some of the conspiracy's money laundering activities, and put names to faces and owners to vehicles. For example, Willis told law enforcement officials that conspirator Cox, who is not part of this appeal, drove a vehicle originally rented in California. This evidence, along with other testimony, helped show a potential link between the conspiracy and a California supplier. But this link was not critical to the government's case; there was plenty of evidence of the conspiracy's other suppliers. Beyond this, the bulk of Willis's statements consisted of matching license plate numbers with drivers, and describing money wires and the purchase of money orders. This sort of evidence did not directly prove the existence of the drug conspiracy, but was probative of certain defendants' money laundering charges that are not part of this appeal.

Defendants argue that Willis's statements must have been important to the government's case because the prosecutor relied heavily on them in closing arguments. They fail to take into account, however, that the only reason the government mentioned the statements was to remind the jury that they had been corroborated by other evidence presented at trial. Therefore, we decline to hold that the statements mentioned by the government in closing arguments were important to its case.

Finally, those aspects of Willis's statements that were arguably important to the government's case were cumulative. For example, Willis told law enforcement officials that he watched Spradley oversee the transfer of two kilos of

drugs from one vehicle to another. This same incident was testified to by coconspirator William Cox, who described the transaction in much greater detail. Accordingly, we hold that any error in the admission of Willis's statements was harmless./6

b. Coconspirator waiver

For those defendants who did not participate in Willis's murder or its cover-up (Stephanie Johnson and Anthony Thompson), the government urges us to follow United States v. Cherry, 217 F.3d 811 (10th Cir. 2000). Cherry holds that if a murder is reasonably foreseeable to a conspirator and within the scope and in furtherance of the conspiracy, the conspirator waives his right to confront that witness just as if he killed the witness himself. Although we believe that Cherry is well-reasoned, we find thatWillis's murder was not reasonably foreseeable to these defendants. But because admission of the statements was harmless, the error does not require reversal.

i.  United States v. Cherry

The Tenth Circuit's decision in Cherry involves three main points. We summarize them briefly and explain why we find them persuasive. First, coconspirator waiver is consistent with waiver-by-misconduct jurisprudence. Several waiver-by-misconduct cases recognize the possibility of imputed waiver, although none ruled explicitly on the question. In Olson v. Green, 668 F.2d 421 (8th Cir. 1982), the Eighth Circuit noted that someone acting on a defendant's behalf may waive his hearsay and Confrontation Clause objections. Id. at 429. Also, one of the Supreme Court's early waiver-by-misconduct cases (not cited in Cherry) contains similar language, saying that waiver may be "actual or imputed." Snyder v. Com. of Mass., 291 U.S. 97, 106 (1934).

Coconspirator waiver fits within the federal rules's codification of the waiver-by-misconduct rule as well. Under Rule 804(b)(6), a defendant who "acquiesces in conduct intended to procure the unavailability of a witness" waives his hearsay objection. We agree

with the Tenth Circuit that, by using the term "acquiesce," the drafters of Rule 804(b)(6) expressed an intent to allow for the imputation of waiver. See Cherry, 217 F.3d at 816. This makes sense because acquiescence itself is an act. See Webster's Third New Int'l Dictionary 18 (1986) (defining acquiesce as "to accept or comply tacitly or passively"). And when that act is done intentionally and voluntarily it is no less valid as a means of waiver than the decision to more directly procure the unavailability of a witness by, for example, murdering a wit ness oneself.

Second, coconspirator waiver strikes the proper balance between protecting a defendant's confrontation rights and preventing witness tampering. See Cherry, 217 F.3d at 820. Without a rule of coconspirator waiver, the majority of the members of a conspiracy could benefit from a few members engaging in misconduct. Such a result is at odds with the waiver-by-misconduct doctrine's equitable underpinnings. Cf. White, 116 F.3d at 911.

Third, as a practical matter, "[i]t would make little sense to limit forfeiture of a defendant's trial rights to a narrower set of facts than would be sufficient to sustain a conviction and corresponding loss of liberty." Cherry, 217 F.3d at 818. Pinkerton established the rule that a defendant may be held liable for acts committed by her coconspirator that were within the scope and in furtherance of the conspiracy, and were reasonably foreseeable to her. See Pinkerton, 328 U.S. at 647; see also United States v. Sandoval-Curiel, 50 F.3d 1389, 1392 (7th Cir. 1995). Under this rule, a defendant may be held criminally responsible for any act committed in furtherance of the conspiracy, including acts taken to prevent apprehension. See United States v. Williams, 81 F.3d 1434, 1439 (7th Cir. 1996); United States v. Nowak, 448 F.2d 134, 139 (7th Cir. 1971). Witness tampering is one example of these sorts of acts, see, e.g., United States v. Maloney, 71 F.3d 645, 661 (7th Cir. 1995), and, of course, can constitute waiver-by-misconduct.

Not only do we agree with the reasoning of the majority in Cherry, but the dissent in Cherry does not persuade us to

reject coconspirator waiver. The dissent primarily focuses on the idea that mere membership in a conspiracy should not be sufficient to establish waiver. Accord United States v. White, 838 F.Supp. 618 (D.D.C. 1993) aff'd, 116 F.3d 983 (D.C. Cir. 1997). We agree with this proposition and believe that it is inherent in our holding--for waiver to be imputed to a conspirator, the conduct resulting in the witness's unavailability must have been committed in furtherance of the conspiracy, within its scope, and reasonably foreseeable to the conspirator. Cf. Williams, 81 F.3d at 1441 (engaging in particularized foreseeability inquiry). In addition, the Cherry dissent's reliance on a quote from Olson v. Green that states that constitutional rights are "personal to the accused" is unavailing. That phrase was first iterated by the Eighth Circuit in United States v. Carlson, 547 F.2d 1346 (8th Cir. 1976), to make the point that a defendant may not revive at trial through his counsel a right he previously, "personally" waived. Id. at 1359, n. 11. The Carlson court's use of the phrase does not express a disapproval of imputed waiver.

To the extent that the Cherry dissent's reliance on the phrase "personal to the accused" communicates a concern that the imputation of waiver will result in the unintentional waiver of defendants' rights (compare Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("[F]or waiver to be effective, it must be intentional.") with Sandoval-Curiel, 50 F.3d at 1392 ("A defendant is responsible for a substantive offense committed by his coconspirators . . . even if the defendant does not have knowledge of it.")) we believe that the formulation of the rule we adopt today will insure that the conspirator's waiver meets this constitutional standard. By limiting coconspirator waiver-by-misconduct to those acts that were reasonably foreseeable to each individual defendant, the rule captures only those conspirators that actually acquiesced either explicitly or implicitly to the misconduct.

Finally, the act of misconduct in this case is not relevant to our waiver inquiry. There is a possibility that the specific intent requirement necessary to

support a conviction for first-degree murder will be lost in of the application of Pinkerton to the waiver context. Cf. Clark v. Louisiana State Penitentiary, 694 F.2d 75, 78 (5th Cir. 1982) (expressing concern that jury inappropriately convicted conspirator of first-degree murder under Pinkerton based solely oncoconspirator's intent). There is no cause for concern, however, because (in those cases that involve premeditated murder) the specific intent requirement is captured by the reasonable foreseeability qualification. Waiver may be imputed only to those conspirators to whom it was reasonably foreseeable that another conspirator would engage in premeditated murder in furtherance and within the scope of the conspiracy. Accord United States v. Tse, 135 F.3d 200, 206-07 (1st Cir. 1998) ("If [the conspirator] possessed the requisite intent when he entered into the conspiracy then all foreseeable crimes committed by the conspiracy can be attributed to that intent."). It is also conceivable that some cases will involve non-premeditated murder, in which circumstance there is no specific intent requirement./7 See Haas v. Abrahamson, 910 F.2d 384, 399 (7th Cir. 1990) (internal citation omitted).

In sum, a defendant who joins a conspiracy risks many things--e.g. the admission of his coconspirator's statements at trial under Federal Rule of Evidence 801(d)(2)(E), the potential conviction for substantive offenses committed in furtherance of the conspiracy, and the inclusion of his coconspirator's acts in the computation of his relevant conduct at sentencing. We see no reason why imputed waiver should not be one of these risks, particularly when the waiver results from misconduct designed to benefit the conspiracy's members. For these reasons and the others expressed above, we follow the Tenth Circuit's decision in Cherry and hold that the waiver-by-misconduct of one conspirator may be imputed to another conspirator if the misconduct was within the scope and in furtherance of the conspiracy, and was reasonably foreseeable to him.

ii.  The Cherry rule applied

However, we conclude that Marcus Willis's murder was not reasonably foreseeable to Stephanie Johnson and Anthony Thompson. There is no evidence that these defendants knew or had reason to know that an informant would be murdered. Cf. United States v. Romero, 897 F.2d 47, 51-52 (2d Cir. 1990) (holding that conspirators could be held criminally liable for coconspirator's assault and attempted murder of a federal officer "[g]iven the ammunition spread around the apartment, the precautions [two of the conspirators] took to ensure the informants were neither armed nor police, and the stationing of [one conspirator] as an armed triggerman in the closet."). As we noted in our discussion of the First-Degree Murder Guideline, there is no evidence that this conspiracy had previously engaged in murder or attempted murder. Therefore, we find that Willis's murder was not reasonably foreseeable to either of these defendants.

C. Apprendi Violations

All the defendants, except Johnson, challenge their sentence based on the rule established in Apprendi v. New Jersey, 530 U.S. 466 (2000), that any fact (other than a prior conviction) that increases the sentence beyond the statutory maximum must be submitted to the jury and proven beyond a reasonable doubt. The defendants claim that the district court erred by failing to submit drug quantity to the jury because drug quantity determines the maximum sentence under 18 U.S.C. sec. 841(a). See United States v. Nance, 236 F.3d 820, 825 (7th Cir. 2000) (holding that it is Apprendi error not to submit drug quantity to the jury). Because the defendants did not object below, plain error is the appropriate standard of review. Id. To succeed on plain error review, the defendants must show that a jury would not have been able to find that the conspiracy distributed over five kilos of cocaine, the amount necessary to support the sentences imposed by the court. See id. at 826. Based on the evidence presented at trial, the defendants cannot make that showing.

The vast majority of the testimony from which the jury could conclude that a conspiracy existed among these defendants

involved transactions amounting to over five kilos. For example, Terrence Pierce, a buyer who was not indicted for his role in the conspiracy, testified that he witnessed Spradley purchase 15 kilos from a supplier. Keith Cork, a coconspirator who pled guilty, interpreted drug ledgers found in Spradley's trash to indicate that, at one point, Spradley had 20 kilos to sell, and he testified that the conspiracy dealt in hundreds of kilos. James Douglas, a customer, testified that Boddie delivered more than 5 kilos to him over the course of several years. This kind of testimony connected each of the defendants to the conspiracy.

In contrast, the testimony that described transactions of less than five kilos did not connect the defendants together. For example, Dwayne Gibson, another co-conspirator who pled guilty, testified that he saw Boddie and Walker rinsing ounces of crack in the sink at Walker's residence. This testimony could support an inference of a conspiracy between Boddie and Walker, but does not connect Boddie and Walker to Spradley, Thompson, or any other members of the conspiracy charged here.

The only evidence supporting an inference of conspiracy among each of the defendants that describes a less-than-five-kilo transaction was that of Officer Neukam, relaying the uncorroborated hearsay testimony of murdered informant Marcus Willis. We think it unlikely that the jury would have relied solely on this evidence to convict the defendants of conspiracy for two reasons. First, uncorroborated hearsay testimony is not particularly compelling. Second, and more to the point, it is much more likely that when determining that the conspiracy trafficked in over five kilos, the jury relied on the overwhelming evidence that the conspiracy trafficked in over five kilos, which included not only the testimonial evidence described above but additional evidence presented at trial of conspiracy members' purchases of extravagant vehicles, homes, and motorcycles (amounting to over $500,000) as well as the seizure during the pendency of the conspiracy of over $350,000 that was never reclaimed.

Based on the totality of this evidence, we believe that any reasonable jury would

have concluded that the conspiracy distributed in excess of five kilos. Therefore, the district court's failure to submit drug quantity to the jury was not plain error worthy of reversal./8

D. Disclosure of Presentence Reports

The defendants assert that the district court abused its discretion by refusing to disclose the contents of several presentence reports after reviewing the sealed reports in camera. Relying on United States v. Corbitt, 879 F.2d 224 (7th Cir. 1989), the district court refused to disclose the reports because the material contained within them was, for the most part, cumulative and to the extent that it was not cumulative, it was not "absolutely essential to the effective presentation of a defense"/9 and therefore not required in the interests of justice. The defendants disagree with the district court's approach, arguing that "[d]ue process and the defendant[s'] right[s] to the effective assistance of counsel compelled the disclosure of the pre-sentence reports," irrespective of whether the material was cumulative or actually necessary to the effective presentation of their defense. They are wrong. We squarely rejected this argument in United States v. Dweck, 913 F.2d 365 (7th Cir. 1990), which is consistent with the approach followed here by the district court. The defendants have not articulated, nor can we think of, any reason to revisit that opinion./10

E. Severance

Defendants Johnson, Boddie, Thompson, and Walker argue that the district court erred by joining all the defendants and their various charges under Rules 8(a) and (b) of the Federal Rules of Criminal Procedure and denying their Rule 14 motion to sever. They wanted to be tried separately from Spradley, White, and Jones, who were larger players in the drug conspiracy and had been charged with crimes relating to Marcus Willis's murder.

We find no error here. Joinder of the murder-related charges and the drug conspiracy was proper under Rule 8(a) because Willis's murder was charged as an overt act of the conspiracy and,

therefore, part of the same act or transaction constituting parts of a common scheme or plan. See United States v. Curry, 977 F.2d 1042, 1049 (7th Cir. 1992); Fed. R. Civ. P. 8(b). The fact that each of the defendants were part of a common conspiracy is also enough to justify joinder under Rule 8(b), which provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." See United States v. Ramirez, 45 F.3d 1096, 1100 (7th Cir. 1995); United States v. Schweihs, 971 F.2d 1302, 1321 (7th Cir. 1992); Fed. R. Civ. P. 8(b).

Regarding their Rule 14 misjoinder challenge, the key question is whether the jury was able to sort out the evidence against Johnson, Boddie, Thompson, and Walker, and fairly judge their actions. See United States v. Thornton, 197 F.3d 241, 255 (7th Cir. 1999). We believe that the jury was able to do so; the district court instructed the jury to give each defendant separate consideration and we normally presume that the jury followed the court's instruction. See United States v. Johnson, 248 F.3d 655, 665 (7th Cir. 2001). Furthermore, it is clear that this presumption proved to be true in this case because the jury hung with respect to Johnson on the drug conspiracy charge and also acquitted several defendants not part of this appeal. We cannot imagine that a jury able to distinguish between defendants for this purpose could not also distinguish between the differing levels of participation attributable to each defendant. The jury also acquitted Spradley, Jones, and White of the murder-related charges, making it highly unlikely that the remaining defendants were prejudiced by the joinder of the murder-related charges with the conspiracy charge. Therefore, Johnson, Boddie, Thompson, and Walker have not shown that they were actually prejudiced by the district court's refusal to sever and, accordingly, their challenge fails. See United States v. Pigee, 197 F.3d 879, 891 (7th Cir. 1999).

F. Other Acts Evidence

The defendants argue that the district court abused its discretion by admitting, under the "intricately related" theory, evidence of several violent acts alleged to have been perpetrated upon or committed by conspiracy members. Evidence that is "so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime" is excluded from Federal Rule of Evidence 404(b)'s prohibition against other acts evidence admitted to show "action in conformity therewith" and, therefore, may be admitted at trial. United States v. Bogan, 267 F.3d 614, 622 (7th Cir. 2001) (internal citation omitted). So if the evidence is "intricately related," "connected," or "intertwined" in this manner, the district court did not abuse its discretion by admitting the evidence. See id.

The evidence challenged by the defendants can be broken into two groups, each of which we believe was properly admitted. Group one includes evidence relevant to the murder of Marcus Willis: (a) the shooting of an unrelated person at Spradley's night club whose blood was later found in White's Yukon, the vehicle in which Willis was murdered; and (b) the state murder charges against Spradley and White that were dismissed in favor of federal prosecution. This evidence was introduced to fill a conceptual void for the jury. Evidence of the shooting at Spradley's night club explained why another individual's blood was found in White's Yukon. The jury would have been left to question the source of the blood had this evidence not been admitted, because the blood did not match that of any of the conspirators. The documents pertaining to Spradley's and White's state murder charges were introduced only to clarify the timing of the events surrounding the murder. Because the jury acquitted Spradley and White of all murder-related charges, we know the jury did not improperly infer "action in conformity therewith" from the state murder charging documents. Therefore, we conclude that this evidence was properly admitted because it completed the story of and provided context for the murder-related charges. See United States v. Jackson, 33 F.3d 886, 874 (7th Cir. 1994).

The second group of disputed evidence includes evidence of several non-fatal shootings and an alleged kidnaping. The government introduced evidence that Spradley's girlfriend, who then served as the safekeeper of the conspiracy's proceeds, had been shot by an attempted robber. This evidence was introduced to explain why Robert Johnson, a coconspirator not part of this appeal, took over the role of safekeeper, providing background for the jury to judge the credibility of this important witness's testimony. Other shootings were alleged to have been committed by conspiracy members in retaliation for the attempted robbery of Spradley and a purchaser's failure to fully repay Spradley for fronted cocaine, among other reasons. For similar reasons, several conspiracy members allegedly kidnaped a supplier who failed to procure the cocaine he promised./11 This kind of evidence is intricately related to the drug conspiracy charge because it shows how the conspiracy conducted its "business." See United States v. Diaz, 176 F.3d 52, 79 (7th Cir. 1999) (affirming admission of evidence of violence committed on behalf of drug conspiracy because it explained the mutual trust between coconspirators); United States v. Molina, 75 F.3d 600, 602 (10th Cir. 1996) (affirming admission of evidence of defendant's repossession of car at gunpoint because it showed his organizational role in the drug conspiracy); United States v. Rodrequez, 859 F.2d 1321, 1327 (8th Cir. 1988) (affirming admission of evidence that defendant beat a person with a pistol for failure to repay a loan because it showed how conspiracy operated)./12 Accordingly, the district court did not abuse its discretion by admitting this evidence.

As a fallback position, the defendants argue that the evidence of violent acts was unduly prejudicial under Federal Rule of Evidence 403. They assert that the cumulative impact of the evidence improperly aroused the jury members' emotions and encouraged them to conclude that the defendants were bad characters that must be guilty. We agree with the general proposition that evidence of kidnapings and shootings can be gruesome and shocking, though we question whether the scant evidence of violence presented

here fits that description. In any event, we cannot imagine that this jury, which acquitted Spradley, Jones, and White of the murder-related charges and was presented with abundant, non-violent evidence of the drug conspiracy and each defendant's participation in it, decided the case on an emotional basis rather than upon the evidence presented. See Bogan, 267 F.3d at 623; United States v. Thomas, 155 F.3d 833, 836 (7th Cir. 1998) (applying harmless error analysis to Rule 403 evidentiary question). The defendants' conclusory assertions to the contrary do not provide us with any basis for reversal given the great amount of deference we must accord the district court's evidentiary ruling. See United States v. Foster, 939 F.2d 445, 457 (7th Cir. 1991).

G. Thompson's Challenges

1. Drug conspiracy conviction

Anthony Thompson mounts the rarely successful challenge to the sufficiency of the evidence supporting his conspiracy conviction. See Thornton, 197 F.3d at 253. We will affirm a jury conviction for drug conspiracy unless the defendant can show that no reasonable factfinder could have found the essential elements--two or more people agreed to commit the unlawful act of drug trafficking, and the defendant knowingly and intentionally joined in that agreement--beyond a reasonable doubt. See id. at 254 (internal citations omitted). Thompson has not met this burden, but instead waived his challenge by failing to adequately argue his position.

There was no discussion of Thompson's challenge in oral argument, and describing the arguments made in his brief as unhelpful would be an understatement. In five sentences without any supporting factual details, Thompson simply argues that the government failed to present evidence that he knew of, was a member of, or participated in, a drug trafficking conspiracy. Further, he fails to identify the elements necessary for establishing his guilt (or innocence) or to cite a single case or fact in support of his argument.

What we find more problematic is Thompson's failure to discuss the evidence that was presented against him,

rather than stating in a conclusory manner that the government did not present enough. He did not even file a reply brief to challenge the evidence the government laid out in its response brief. Thompson's argument is perfunctory and therefore waived. See United States v. McClellan, 165 F.3d 535, 550 (7th Cir. 1999).

Even if not waived, we would reject Thompson's challenge. The government's case against him included evidence that he waited for shipments of 25 to 30 kilos of cocaine with other conspirators, had received at least 0.5 kilos from a coconspirator on credit, and frequented coconspirator Walker's residence--where cocaine was cooked into crack. This evidence is sufficient to support his conviction. See United States v. Gutierrez, 978 F.2d 1463, 1469 (7th Cir. 1992) (holding that defendant's participating in one drug transaction with alleged coconspirators was sufficient to support conspiracy conviction).

2. Attribution of drug quantity at sentencing (sec. 2D1.1(a)(3))

At sentencing, the district court attributed five kilograms of cocaine to Thompson for his participation in the conspiracy under U.S.S.G. sec. 2D1.1(a)(3). It based its conclusion on the fact that Thompson was "involved in the conspiracy for a significant period of time, and [ ] the logical conclusion [from that] is that he was personally in receipt of the kilogram of cocaine more than once." It is not clear from the record what "kilogram" the district court is referring to in its ruling. Maybe the court meant to say "0.5 kilograms"; there was evidence that Thompson received 0.5 kilos of cocaine from coconspirator Keith Cork on more than one occasion. From the face of its ruling, however, we cannot tell. The usual recourse in this situation is to remand for the district court to make more explicit findings, see United States v. Mojica, 984 F.2d 1426, 1445 (7th Cir. 1993), but that is not necessary here. We can affirm despite the court's insufficient findings unless Thompson can make a colorable argument that there is no adequate basis in the record to support the attribution. See

id.

Thompson cannot make a colorable argument against attribution. The conspiracy trafficked in well over five kilos of cocaine and whatever portion of this amount that was reasonably foreseeable to Thompson is attributable to him as relevant conduct. See United States v. Strauser, 21 F.3d 194, 196-97 (7th Cir. 1994); U.S.S.G. sec. 1B1.3(a). The district court's finding that Thompson was involved in the conspiracy for a significant period of time sufficiently supports the conclusion that at least five kilos of the conspiracy's total was foreseeable to him. The court's finding is further supported by the evidence that he waited along with several coconspirators for cocaine shipments of 25 to 30 kilos on more than one occasion. Thompson has not argued that his coconspirators' quantities were not foreseeable to him, therefore, the district court's attribution of five kilos to Thompson at sentencing was not error. See Mojica, 984 F.2d at 1445 (affirming attribution of 6.5 kilos based primarily on evidence that defendant participated in the delivery of an amount representing about 20 percent of the total quantity attributable to the conspiracy).

3. Firearm possession guideline (sec.2D1.1(b)(1))

Finally, Thompson argues that the district court improperly applied the Guideline enhancement for possession of a firearm. For this Guideline to apply, it is sufficient for the defendant to have possessed the gun at any point during the pendency of the conspiracy. See United States v. Bjorkman, 270 F.3d 482, 494 (7th Cir. 2001). The district court based its application, in part, on Thompson's state court conviction resulting from his possession of a firearm found on him during a search of one of the conspiracy's stash houses where drug paraphernalia and other weapons were found. This incidence of possession occurred while the conspiracy was still in operation. Therefore the district court's application was proper. See Bjorkman, 270 F.3d at 494 (affirming application involving similar facts); United States v. Billops, 43 F.3d 281,

288 (7th Cir. 1994).

## H. Johnson's Money Laundering Conviction

Stephanie Johnson argues that the Government did not prove beyond a reasonable doubt that she knew that the proceeds involved in the money laundering transactions--which she admits she completed--were from drug sales./13 Johnson is correct in asserting that her convictions are invalid without sufficient evidence that she knew the proceeds derived from an illegal activity, see United States v. Gracia, 272 F.3d 866, 873 (7th Cir. 2001) (conspiracy to commit money laundering); United States v. Rodriguez, 53 F.3d 1439, 1447 (7th Cir. 1995) (substantive money laundering), but her argument that the government's evidence is insufficient is frivolous.

The jury was presented with ample evidence to support the knowledge element of Johnson's substantive money laundering and conspiracy to commit money laundering charges. A 1997 Ford Expedition was purchased in Johnson's name with coconspirator Spradley's funds in May of 1997, a period of time for which she does not dispute that Spradley had no other source of legitimate income. Drug ledgers and paraphernalia, small amounts of cocaine, close to $2,000 in cash, and several loaded firearms were found in Johnson's bedroom along with Johnson's identification and pager bill during a police search of the home she shared with coconspirator Boddie on February 24, 1994. Two witnesses testified that she observed drug transactions and even engaged in drug trafficking herself, and photographs of her with various conspiracy members were introduced at trial. Johnson argues that we should not consider the evidence stated in the previous sentence because she was acquitted of her drug conspiracy charge. But we do not know the basis for the jury's acquittal, see United States v. Reyes, 270 F.3d 1158, 1168 (7th Cir. 2000) (listing possible reasons for inconsistent verdicts), and the fact that it convicted her of the money laundering charges suggests that the acquittal was not based on a belief that she was unaware of the conspirators' drug activities. Accordingly, we conclude that there is more than sufficient basis for

the jury's verdict. See United States v. Rodriguez, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (holding that it was reasonable for a jury to conclude that the defendant was aware of the illegal source of the funds based on his knowledge of and minimal participation in drug transactions). Accord, United States v. Atterson, 926 F.2d 649, 656 (7th Cir. 1991).

III.  CONCLUSION

   For the reasons stated above, we affirm each of the defendants' convictions and remand for the resentencing of defendants Jones and White.

FOOTNOTES

/1 The remaining counts, including count 4 for using a firearm during a drug conspiracy and other money laundering-related counts, are not relevant to this appeal.

/2 The question of what conduct may support the application of a cross reference to a defendant is governed by the cross reference itself, within the constraints set by the general relevant conduct guideline--sec.1B1.3. See U.S.S.G. sec.1B1.3(a); United States v. Masters, 978 F.2d 281, 284-85 (7th Cir. 1992).

/3 They also argue that the district court erred by basing the Guideline calculation on conduct for which they were acquitted. We rejected this argument in United States v. Meyer, 157 F.3d 1067, 1081 (7th Cir. 1998) and the defendants have not suggested why its holding should be reconsidered.

/4 For example, White testified that he left his sports utility vehicle at the Wagon Wheel Restaurant the night of the murder and picked it up that next morning, undamaged. This statement is inconsistent with the scientific evidence that Willis was murdered in White's sports utility vehicle by 12:45 a.m. that morning. The court concluded that White participated in the cover-up because he often used the name "Demarco," the same name used by the party who scheduled the appointment to have the vehicle repaired at Mobile Jamzz.

/5 Though technically a hearsay exception, Rule 804(b)(6) is really a waiver provision. Fed. R. Evid. advisory committee note to subdivision (b)(6) ("Rule 804(b)(6) has been added to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's

prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness.").

/6 For the same reasons, we believe that any error in the admission of the statements on the grounds that they lacked "particularized guarantees of trustworthiness" as that term has been defined by Ohio v. Roberts, 448 U.S. 56 (1980), and its progeny, is harmless as well. As to the merits of this challenge, the government has not told us nor can we imagine what, in the circumstances surrounding the making of Willis's statement, makes them inherently reliable. See United States v. Becker, 230 F.3d 1224, 1230 (10th Cir. 2000).

/7 For example, a defendant who locked a witness in a storehouse stocked with food and water not knowing that the witness suffered from acute asthma could not be held liable for first-degree murder in the event that the witness died, but could be deemed to have waived his objections because he engaged in an act that resulted in the witness's unavailability.

/8 In any event, the defendants seem to have conceded as much. They state in their joint brief's statement of facts that "[c]ocaine belonging to Spradley was periodically delivered to [other conspiracy members] in kilo and multi-kilo amounts [and] was later distributed to [other co-conspirators] for sale." They further admit to the collection of over $350,000 in cocaine proceeds.

/9 As for impeachment evidence pertaining to coconspirator Alfred Edmonson, the court held evidentiary hearings, ordered the government to produce documents, reviewed agent notes, and found no undisclosed impeachment material. The only evidence the defendants' mention on appeal that they hope to find in Edmonson's materials duplicates evidence offered at trial. Therefore the district court properly refused to disclose them. See United States v. Dweck, 913 F.2d 365, 371 (7th Cir. 1990) (stating that cumulative impeachment evidence does not violate Brady).

/10 We have also reviewed the sealed reports. See United States v. Anderson, 724 F.2d 596, 599 (7th Cir. 1984). Much of the information was duplicitive--reiterating portions of previously disclosed reports that were common to multiple defendants. The portions of the reports that were not made available to the defendants were also not necessary for their defense.

/11 We use the term "allegedly" because the defendants dispute the accuracy of the testimony supporting these assertions and the jury was not

required to believe the testimony to convict these defendants of drug conspiracy.

/12 One could also argue that this kind of evidence helps to prove the existence of a drug conspiracy under the "tools of the trade" theory recognized by this court and others, though we do not resolve this issue today. See, e.g., Diaz, 176 at 179; cf. United States v. Ramirez, 45 F.3d 1096, 1103 (7th Cir. 1995) (admitting evidence of a pistol found in the defendant's apartment on the theory that weapons are tools of the drug trafficking trade); United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991) ("[I]n admitting firearms and large amounts of cash, courts have recognized the high level of violence that is not uncommonly associated with the drug distribution business."); id. at 1083-84 (collecting and discussing similar cases).

/13 Johnson was convicted under sec.sec. 18 U.S.C. 1956(a)(1)(B)(i) and 1956(h). "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" violates 18 U.S.C. 1956(a)(1)(B)(i). 18 U.S.C. 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those proscribed for the offense of the commission of which was the object of the conspiracy."