# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01053-COA

JAMES McCLUNG A/K/A JAMES EARL McCLUNG JR.          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2017 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | CHARLES R. MULLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED-12/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., CARLTON, P.J., AND C. WILSON, J.**

**CARLTON, P.J., FOR THE COURT:**

¶1. A shooting occurred on Highway 82 West outside of Itta Bena, Mississippi, late on a Saturday evening in August 2015. A group of men in a light-colored Tahoe pulled up next to a red Pontiac, and one or more of the men began shooting as both vehicles were traveling west on Highway 82. Shortly after the shooting, Jacarius Keys, accompanied by counsel, gave a statement to the chief investigator on the case. In his statement, Keys said that he was driving the Tahoe, and he also implicated four other men, as follows: James Earl McClung Jr., Sedrick Buchanan, Michael Holland, and Armand Jones. In July 2016, all five men,

Keys, McClung, Buchanan, Holland, and Jones, were co-indicted for the murder of one man in the red Pontiac and for the attempted murders of the three other men in the Pontiac. Keys was killed on December 28, 2016—a year and a half after the shooting and from when Keys gave his statement, and approximately five months after the joint indictment was returned. The remaining four co-indictees were subsequently tried together in the Leflore County Circuit Court in May 2017. Keys's videotaped statement was admitted into evidence and played at the defendants' trial.

¶2. This appeal concerns only McClung. After a four-day trial, the jury found McClung guilty of three counts of the lesser-included offense of aggravated assault. He was sentenced to serve three consecutive terms of twenty years in the custody of the Mississippi Department of Corrections (MDOC). McClung appeals.[1] Concluding that McClung's confrontation rights were violated in this case when Keys's statement was admitted into evidence against McClung's objections, and that the trial court abused its discretion when it denied McClung's motion for severance, we reverse McClung's convictions and sentences and remand for a new trial.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. The record reflects that D'Alandis Love, Perez Love, Kelsey Jennings, and Ken-Norris Stigler were traveling west on Highway 82 about 11:00 p.m. on August 15,

---

[1] The other three defendants were also found guilty and appealed their convictions and sentences. The appeals filed by McClung, Buchanan, and Jones were initially docketed by the Mississippi Supreme Court Clerk under one docket number, 2017-KA-01053. This Court subsequently entered an order assigning Buchanan's and Jones's appeals to a separate docket number, 2017-KA-1082-COA. Holland's appeal is pending in this Court under docket number 2018-KA-00872-COA.

2015.[2] They were in "Munchie" Brown's red Pontiac and were going to a club in Itta Bena called the Moroccan Lounge. As they were driving, a light-colored Tahoe sped past them, spraying bullets as it went by. D'Alandis Love was killed, and Perez Love, Jennings, and Stigler were seriously injured.

¶4. Shortly after the shooting, Keys, accompanied by his lawyer, went to the Leflore County Sheriff's Office in order to give a statement. He was interviewed by the chief investigator on the case, Bill Staten, on September 2, 2015. When Investigator Staten learned the video equipment had failed during that interview, he re-interviewed Keys, with his lawyer present, on September 3.

¶5. In his interview, Keys said that he was driving the Tahoe, and he also provided information that implicated McClung, as well as Buchanan, Jones, and Holland. After Keys gave his incriminating statement to law enforcement, he went to Attorney Kevin Horan, who represented Jones at trial, and told him that he had done so. To avoid repetition, the details of Keys's statement are addressed below.

¶6. In July 2016, the Grand Jury of Leflore County indicted Jones, Keys, Holland, Buchanan, and McClung for "acting alone or in concert with each other or others" on one count of deliberate-design murder of D'Alandis Love in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014); one count of attempted murder of Perez Love in violation of Mississippi Code Annotated section 97-1-7 (Rev. 2014) and section 97-3-19(1)(a); one count of attempted murder of Jennings in violation of Mississippi Code

---

[2] Kelsey Jennings and Ken-Norris Stigler were D'Alandis and Perez Love's cousins. For ease of reference we will sometimes collectively refer to all four men as the Loves.

3

Annotated sections 97-1-7 and 97-3-19(1)(a); and one count of attempted murder of Stigler in violation of Mississippi Code Annotated sections 97-1-7 and 97-3-19(1)(a).

¶7.     On December 28, 2016, a year and a half after the shooting and when Keys gave his statement, and approximately five months after Jones, Keys, Holland, Buchanan, and McClung were indicted, Keys was killed. The details of Keys's murder will be addressed below in the Court's discussion of McClung's Confrontation Clause assignment of error.

¶8.     McClung, Holland, Buchanan, and Jones were tried together before a jury in Leflore County Circuit Court. Each defendant was represented by his own lawyer.

¶9.     Before trial all of the defendants moved to exclude Keys's videotaped statement. The trial court denied the defendants' motions. The trial court's ruling will be discussed below when the Court addresses McClung's Confrontation Clause assignment of error. After the trial court denied defendants' motions to exclude Keys's videotaped statement, each defendant moved pre-trial to sever his case from the others. The trial court also denied those motions.

¶10.    Trial began on May 16, 2017. The State's witness, Matthew Brown, a deputy with the Leflore County Sheriff's Office, testified that he was on regular patrol on the night of August 15, 2015, and spotted a fire in a field off of Highway 82. Deputy Brown pulled over and approached the scene. He testified that he could see that one person was already out of the vehicle, but others were still inside, with one person trying to climb out of the car through the driver's-side window. Deputy Brown testified that there were no bystanders or other officers at the scene. Jennings was identified as the person outside the vehicle. Deputy

4

Brown helped Perez Love get out of the car through the window and then pulled two unconscious men out of the backseat, Stigler and D'Alandis Love. D'Alandis Love was later pronounced dead at the scene. Deputy Brown testified that he radioed for medical help and the fire department. He also testified that once he realized that it was "not just a car wreck," he called in for the sheriff and the investigator.

¶11.    Bill Staten, an investigator with the Leflore County Sheriff's Office, testified that he responded to the scene at approximately 12:20 a.m. He testified that after he parked his vehicle, he walked to the scene and approached a smoldering vehicle, which he identified as a red Pontiac resting nose up in a deep drainage ditch. Investigator Staten testified that he looked at D'Alandis's body and observed what he believed were gunshot wounds. The other three victims had already been transported to the hospital. Investigator Staten also testified that he examined the red Pontiac and found that the rear-passenger window had been shot out and that there were bullet holes along that side of the vehicle. He took photographs and collected evidence, including a number of 7.62 mm shell casings and one .40-caliber shell casing. These items were recovered within the immediate area of where the vehicle had traveled on (and left) the highway.

¶12.    When Investigator Staten was re-called as a witness later in the trial, he testified that he retrieved a pistol from the red Pontiac the next morning after they had the vehicle towed to a secure location to let it cool off. Mark Steed, an investigator with the Mississippi Bureau of Investigation (MBI) also testified for the State, explaining that he assisted with the investigation and helped collect evidence. Investigator Steed also identified the handgun at

trial that Investigator Staten recovered from the red Pontiac.

¶13. Investigator Staten further testified that Jasmine Cage was at the scene and told one of the deputies that she knew the people in the car and had witnessed the shooting. One of the deputies placed Cage in a patrol car to isolate her while Investigator Staten finished processing the scene. Investigator Staten testified that he then had her transported to the sheriff's office so that he could take her statement.

¶14. After Investigator Staten processed the scene, he testified that he had the Loves' vehicle sent to a secure location to be processed as well. The State's witness, Amber Conn, a crime scene analyst with the MBI, was accepted as an expert in crime scene investigation. She testified that she had examined the red Pontiac, and she opined that the car was shot from the back toward the front. During her investigation of the victims' vehicle, Conn recovered another handgun. This weapon was recovered from the front-passenger floorboard that was identified as a .40-caliber Smith & Wesson pistol. Conn testified that it was fully loaded (one bullet was in the chamber) and that its safety was locked when she found it.

¶15. Lisa Funte, a medical examiner for the State, testified that D'Alandis Love, who had been seated in the back of the red Pontiac on the driver's side, died as a result of multiple gunshot wounds. His manner of death was homicide.

¶16. The State's witness, Starks Hathcock, was accepted as an expert in firearms and tool-marks identification. Hathcock testified that he examined both .40-caliber pistols that were recovered from the red Pontiac and compared them to the .40-caliber bullet that was recovered from Perez Love's head. He was able to confirm that this bullet was not fired by

6

either of the two guns recovered from the red Pontiac. Hathcock also testified that the 7.62 mm shell casings that were recovered from the highway could have been fired from an AK-47 or SKS—some sort of semiautomatic assault rifle, which, he explained, is a weapon designed for war. As addressed in more detail below, one of the surviving victims, Perez Love, testified that he saw Jones in the Tahoe with a "baby assault rifle." Hathcock testified, however, that he could not compare the 7.62 mm shell casings that were recovered to a specific weapon because Jones's AK-47 was never recovered. Hathcock did testify that the projectile jackets that were recovered from the red Pontiac bore similar characteristics to the bullet that was recovered from D'Alandis Love's right chest and the bullet that was recovered from his right leg.

¶17. A number of lay witnesses were also called by the State. Bentravious "Munchie" Brown testified that on the night of the incident he had loaned his red Pontiac Grand Prix to Perez Love, Stigler, Jennings, and D'Alandis Love. He testified that Perez Love drove the vehicle, and the group headed to a club at around 11:00 p.m. Brown testified that he did not know which club they were going to.

¶18. Jasmine Cage, who was Perez Love's girlfriend at the time of the incident, testified that on the night of the shooting, she followed Perez and the others in Brown's car to "make sure Perez was not going to the club." Cage testified that she saw the red Pontiac that Perez and the others were in on Highway 82 ahead of her; after she saw the red Pontiac, she saw a Tahoe or Yukon, and it passed her on her right side. Cage initially testified that she could not see who was in the Tahoe/Yukon and did not know the color of the vehicle. When the

prosecutor reminded Cage about the statement she had given to Investigator Staten shortly after the incident, she then testified that she had told Investigator Staten that she thought the vehicle was gold and that she saw Keys, David Reedy, Jones, and Holland in the vehicle. She testified that she thought Jones was in the front passenger seat and Holland was seated in the back on the passenger side. Cage also testified that when she talked to Investigator Staten after the incident, she told him that Reedy had been driving the Tahoe/Yukon and that Keys was in the backseat on the driver's side.

¶19. Cage testified that after the Yukon passed her, she saw "sparks like fire" a far distance in front of her. Cage called Perez's friend to ask him whether gunfire looks like fire at nighttime, and he said it did. Cage testified that she then drove straight to the Moroccan Lounge. She testified that when she did not see the red Pontiac at the club, she turned around and headed back to Greenwood. On her way back, she testified that she saw the red Pontiac on fire in the field. She stopped her car, got out, and approached the scene. She began crying because she knew Perez was in the vehicle.

¶20. On cross-examination, Cage testified that she knew McClung and that she did not see him in the vehicle that night.

¶21. Two of the surviving victims of the shooting, Stigler and Perez Love, testified that Jones and Holland had been the ones who fired bullets at Perez Love, D'Alandis Love, Stigler, and Jennings as they were traveling on Highway 82 in the red Pontiac. Jennings, the other surviving victim, testified that he knew that a vehicle had pulled up beside them and someone opened fire on them in the red Pontiac, but he could not identify either the vehicle

8

or anyone in it.

¶22.   Stigler and Perez both testified that the shooters were traveling in a beige or gold Tahoe-type vehicle. Perez testified that he saw defendant Jones in the Tahoe with a "baby assault rifle." He explained that it was sometimes called "a mini-Draco." Stigler testified that he saw Holland shooting a pistol from the vehicle, and Perez also said that he saw Holland with a pistol through the window of the Tahoe as the Tahoe passed them. Stigler also testified that he saw Jones shoot Perez in the top of the head. On cross-examination, both Stigler and Perez testified that they did not see McClung in the vehicle that night.

¶23.   Perez testified at trial that he could not positively identify anyone in the vehicle besides Holland and Jones. He admitted, however, that he had given a statement after the incident while he was hospitalized and identified other people, including Reedy and Keys, in the vehicle.[3] Perez testified that he identified the people in the Tahoe because he saw "all of them" riding in the vehicle every day, and he thought they were in the vehicle that night. Later in his testimony Perez said that after he thought about it more, he realized that he never really saw anyone except Jones and Holland. On cross-examination, Perez also testified that he thought Reedy was in the Tahoe that night because Reedy used to own the Tahoe.

¶24.   As noted above, Keys gave a videotaped statement to Investigator Staten a few weeks after the incident. He was indicted along with McClung, Buchanan, Jones, and Holland, but

---

[3] Investigator Staten testified that he thought Perez had identified Buchanan, but Investigator Staten was not sure. Defense counsel specifically questioned Perez about whether he had identified Buchanan, but at trial Perez said he never saw Buchanan and, other than Jones and Holland, he could not recall who he had previously identified.

Keys was not available at trial because he had been killed months earlier.[4] Keys's videotaped statement was admitted into evidence as the State's exhibit S-6 and was played for the jury. It was not transcribed.

¶25. In his statement, Keys said that he was driving the gold Tahoe on the night of the shooting. He said that Holland and Jones were on the passenger side, McClung was in the rear seat of the driver's side, and Buchanan was sitting in the third-row seat.[5] According to Keys, he, Holland, Jones, Buchanan, and McClung had been at Holland's house on the night of the shooting. Around 11:00 p.m., they all got in Keys's car to go to the Moroccan Lounge in Itta Bena.

¶26. Keys said that Jones brought his AK-47 with him, which Keys described as being "short with a long magazine." Keys said he did not know that Jones had it with him when they got in his car. He said that he did not know Jones had it until "he first upped it" (meaning until Jones began shooting it later than night). Keys also said at the end of his statement that Jones had the AK-47 that night because "he always had it." Although at one point in his statement Keys said that he was unsure whether anyone else had a weapon, at the end of his statement, Keys said that no one had a gun except Jones.

¶27. Keys said that there had not been any previous discussion among the group of gunning down the Loves or of retaliation against them. However, when questioned specifically about

---

[4] The jury was not told that Keys had been killed.

[5] In comparison, Cage and Perez identified Reedy as the person driving the vehicle while Keys was in the backseat. In his statement, Keys said that he was driving and Reedy was not with them.

Jones, Keys said that Jones had said "days earlier" that he needed to get one of them (the Loves) because they (the Loves) "had got some of their friends."

¶28. Keys said that as they drove down Highway 82 toward Itta Bena, they approached a car and Jones called out that it looked like the Loves were in that car.[6] As they passed the vehicle, according to Keys, Jones rolled down the window, leaned out the window, and opened fire with his AK. Keys said that, as soon as Jones started shooting, Jones said, "Go, go, go," and Keys sped up to get away.

¶29. As they drove away, Keys said that Holland made a call to someone to get rid of the car because of the shooting. Keys said that there was no discussion about this until after Holland got off of the phone, and then Holland said that they needed to get rid of the car. Keys said he drove to Moorhead, Mississippi, and a mechanic that Holland knew met them in a grey Nissan. The mechanic took Keys's Tahoe, and Keys, Jones, Holland, Buchanan, and McClung drove off in the Nissan. Keys said that the mechanic was going to store his Tahoe at his shop. At the time of trial, the Tahoe had not been recovered.

¶30. Keys said that after they switched cars, they went to a Best Western hotel in Greenwood. When asked who got the room, Keys responded, "McClung." Keys did not state whether McClung had already gotten the room or got it when they arrived at the Best Western. Keys said that when they got to the hotel, Jones brought his gun in with him.

---

[6] Keys said that he did not recognize the car. Perez, however, said in his pretrial statement that Keys was standing outside before Perez and the others had left for the club. When questioned about that statement at trial, Perez testified that his statement was wrong. He said that he meant to say that it was "Munchie" (Bentravius Brown), standing outside, not Keys.

Later, Holland and Jones left together. According to Keys, Jones returned at around 3:00 or 4:00 a.m., and when he returned, he no longer had his gun. Keys said that he, Jones, Buchanan, and McClung spent the night at the Best Western. The next morning, Jones arranged for his own ride home, and Keys, McClung, and Buchanan got a ride together. Keys was dropped off first. Keys said that he stayed with his mother for several days after the shooting until he got a lawyer and turned himself in. While he was at his mother's home in Tennessee, Keys said that Jones contacted him from a phone Keys did not recognize and told him that he was in Chicago. At the time Keys gave his statement on September 3, 2015, Keys had not spoken with anyone else who had been involved in the incident. However, as noted above, after Keys gave his statement to law enforcement, Keys approached Jones's lawyer and told the lawyer that he had given an incriminating statement.

¶31. Investigator Staten testified that he had independently verified that McClung rented the room at the Best Western on the date of the shooting. On cross-examination, however, Investigator Staten admitted that he had no evidence that Keys, McClung, Buchanan, Holland, and Jones were at the Best Western together after the incident, other than Keys's statement. He testified that he "could not conclude or rule out where they re-entered that room that night or that morning at all." Investigator Staten admitted that he was only able to obtain video from the Best Western of McClung when he registered for the room and when he entered and left the room. No one else was on the video and there was no testimony about what time McClung registered and entered and left the room.

¶32. Buchanan turned himself in on September 18, 2015, and Holland was arrested shortly

12

after the incident. Although David Reedy was a suspect who was arrested and jailed for these crimes, the Grand Jury did not indict him.[7]

¶33. The State rested, and McClung, Jones, Buchanan, and Holland moved for directed verdicts, which the trial court denied. No defendant testified or presented any other testimony or evidence.

¶34. After considering the evidence and the instructions that were given, the jury found each of the defendants guilty of various offenses. Relevant to this appeal, the jury acquitted McClung on Count I (deliberate-design murder of D'Alandis Love) and found McClung guilty of aggravated assault with respect to Perez Love, Jennings, and Stigler. The trial court sentenced McClung to serve three consecutive terms of twenty years for each aggravated-assault conviction and ordered McClung to pay court costs and fees. McClung filed a motion for judgment notwithstanding the verdict and for a new trial, which the trial court denied. McClung appealed.

## DISCUSSION

### I.    Admissibility of Keys's Statement Against McClung

#### A.    The Confrontation Clause and Exceptions to the Rule Against Hearsay.

¶35. McClung asserts that the trial court erred in allowing Keys's statement into evidence against him because it violated McClung's right to confront the witness as guaranteed by the

---

[7] The record reflects that surveillance footage was recovered during the investigation that appeared to show Reedy at a Batesville gas station forty minutes prior to the incident.

Sixth Amendment of the United States Constitution[8] and Article 3, Section 26 of the Mississippi Constitution,[9] which both provide a defendant the right to confront a witness against him. McClung also asserted that the statement was inadmissible hearsay.[10] In general, the standard of review "regarding admission or exclusion of evidence is abuse of discretion." *Jenkins v. State*, 102 So. 3d 1063, 1065 (¶7) (Miss. 2012). However, we review a Confrontation Clause objection de novo. *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008). For the reasons addressed below, we find that the trial court erred in allowing Keys's statement against McClung to be admitted at trial, and we reverse and remand McClung's convictions and sentences for a new trial on this basis.

¶36. Before trial, McClung and the other defendants moved to exclude Keys's statement given to Investigator Staten based upon Sixth Amendment and hearsay grounds. The State argued in response that Keys's statement was admissible against each defendant under Rule 804(b)(3) (the statement-against-interest exception) and the exception under Rule 804(b)(5) (the catch-all exception) of the Mississippi Rules of Evidence. The State also argued that Keys's statement was admissible under the forfeiture-by-wrongdoing theory as embodied in Rule 804(b)(6) and caselaw recognizing a similar exception under the Confrontation

[8] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

[9] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Miss. Const. art. 3, § 26.

[10] Hearsay, as defined in Mississippi Rule of Evidence 801, is inadmissible unless the law provides otherwise, including the exceptions in Mississippi Rule of Evidence Rule 804. *See* M.R.E. 802.

14

Clause.[11]

¶37. At the admissibility hearing, the defendants presented one witness, Attorney Kevin Horan, who represented Jones at trial. He testified that Keys had come to his office, told him he was out on bond, and that Keys had told him "the only reason he gave a statement was because he got a lower bond." Horan testified that at that point, he stopped Keys immediately and told him if was going to "change his story" then he needed to do it through counsel. Horan testified that Keys did not "tell me what he said or anything." According to Horan, Keys just "made some other comments and then he left." Horan did not testify whether he told anyone else about Keys's visit to his office. However, the record reflects that Keys's statement was provided to all the co-defendants through discovery at the beginning of the case.

¶38. The State presented two witnesses. The first witness the State called was Sergeant Jeri Bankston, a detective with the Greenwood Police Department, who investigated the Keys shooting that occurred on December 28, 2016. She obtained the video-surveillance footage from the Chevron Station near where the shooting occurred. The video-camera footage was played at the hearing. The footage showed Keys running across the Chevron parking lot with Holland running behind him. Buchanan and other men, including Anthony Flowers, Ladarius Lemock, and Danarius Jackson, were in the parking lot at the same time. The footage also showed Holland with a gun in his hand. Sergeant Bankston testified that she developed five suspects in the Keys case: Holland, Buchanan, Lemock, Jackson, and

---

[11] *See Davis v. Washington*, 547 U.S. 813, 833 (2006); *Crawford v. Washington*, 541 U.S. 36, 62 (2004).

Flowers.

¶39. On cross-examination, Sergeant Bankston admitted that she had no evidence of McClung being involved in Keys's murder and that he was not at the scene of the parking lot. She also confirmed that Jones was in jail at the time of Keys's death. Sergeant Bankston testified that Buchanan was arrested on December 29, 2016, for Keys's shooting and that Holland received a text message from Buchanan when Buchanan was in jail. The caller-ID showed the text message was from "A.J.," whom she believed was Armand Jones. She said that the text message said something to the effect of "Hey, this is Sed." She did not recall what was in the rest of the text message. Sergeant Bankston confirmed that Jones and Buchanan were in jail at the same time when the text message was sent.

¶40. The State's second witness was Investigator Staten, the chief investigator in the Love shooting case. He testified that shortly after the August 15, 2015 shooting, Keys, with his lawyer, came to the Leflore County Sheriff's Office and said that he wanted to give a statement. Investigator Staten was called in to take the statement. He testified that he initially interviewed Keys, with his lawyer present, on September 2, 2015. Due to equipment failure, however, Investigator Staten had to re-interview Keys on September 3, 2015. Keys's lawyer was also present at that interview. The interview was videotaped but not transcribed. The videotaped interview was played for the trial court at the admissibility hearing.

¶41. During cross-examination, Investigator Staten acknowledged that there were inconsistencies in Keys's statement as compared to statements given by other witnesses regarding the people in the Tahoe and where they were sitting.

16

¶42. After argument of counsel, the trial court denied the defendants' motions to exclude Keys's statement and expressed that it would enter a written order stating the reasons supporting its decision to allow the videotaped interview to be admitted into evidence at trial. In its written order, the trial court concluded that Keys's statement was admissible under three exceptions to the hearsay rule: Rule 804(b)(3) (statement against a person's interest); Rule 804(b)(5) (the catch-all hearsay exception); and Rule 804(b)(6) (the forfeiture-by-wrongdoing exception).[12] We address the trial court's rulings below.

¶43. Relevant evidence, as defined in Rule 401, is generally admissible subject to certain laws regarding exclusions and exceptions. *See* M.R.E. 402. Rules regarding hearsay address concerns with admitting evidence that, albeit relevant, is not sufficiently reliable. *See* M.R.E. 801 & advisory committee note. The Mississippi Supreme Court has recognized that "*[n]ontestimonial* hearsay is subject to evidentiary rules concerning reliability rather than being subject to scrutiny under the Confrontation Clause. However, *testimonial* hearsay must be filtered by the Confrontation Clause." *Smith*, 986 So. 2d at 296-97 (¶20) (emphasis added) (citing *Crawford*, 541 U.S. at 36, 53)). Statements given in the course of a police interrogation are testimonial "when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant

---

[12] The trial court primarily relied upon *United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002), in determining that the forfeiture-by-wrongdoing exception applied. The court summarized *Thompson* as follows: "According to the Seventh Circuit, the waiver-by-misconduct of the right to confront witnesses by one conspirator, resulting from misconduct by that conspirator which causes the witness's unavailability, may be imputed to another conspirator if the misconduct was within the scope and in furtherance of the conspiracy, and was reasonably foreseeable to him." (Citing *Thompson*, 286 F.3d at 965).

to later criminal prosecution." *Id.* at 297 (¶21) (quoting *Davis*, 547 U.S. at 822). Under this test, we conclude that Keys's statement was testimonial in that Investigator Staten interrogated Keys to establish events concerning the shooting—events potentially relevant to future criminal prosecution. Accordingly, even if Keys's statement meets the evidentiary reliability rules set forth in Rule 804(b)(3) or Rule 804(b)(5), these rules do not circumvent a defendant's rights under the Confrontation Clause. *Smith*, 986 So. 2d at 298 (¶26) (recognizing that "*Crawford* holds that when dealing with testimonial evidence, a finding of reliability does not create an exception to the Confrontation Clause") (citing *Crawford*, 541 U.S. at 61)); *see Sanders v. State*, 228 So. 3d 888, 891-92 (¶¶12-16) (Miss. Ct. App. 2017) (finding that the circuit court erred when it admitted witness's testimonial statement in violation of the Confrontation Clause of the Sixth Amendment; but finding error harmless under the circumstances of that case).

¶44. A party, however, "who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833; *see also Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds . . . ."). Likewise, under Rule 804(b)(6), a party forfeits his rights to object to a prior testimonial statement on hearsay grounds if the party "wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." M.R.E. 804(b)(6) & advisory committee note.

¶45. The trial court in this case found that Keys's statement was admissible against McClung under the forfeiture-by-wrongdoing doctrine as embodied in Rule 804(b)(6). Like

18

the trial court, we find no Mississippi law interpreting Mississippi Rule 804(b)(6), and thus we electively look for guidance from federal cases analyzing the identical language in Rule 804(b)(6) of the Federal Rules of Evidence and related Confrontation Clause principles.[13]

¶46.    As recognized by the United States Supreme Court, federal Rule 804(b)(6) codifies the equitable doctrine of forfeiture by wrongdoing, *Davis*, 547 U.S. at 833, "which applies only when the defendant engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Giles v. California*, 554 U.S. 353, 367 (2008) (internal quotation mark omitted).  In order for Keys's statement to be admissible against McClung, the State, as the party offering the evidence, was required to prove the facts meeting these requirements as to McClung by a preponderance of the evidence.  *United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018).

¶47.    As the Supreme Court observed in *Giles*, "[e]very commentator we are aware of has concluded the requirement of intent means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367 (internal quotation mark omitted).  The Fifth Circuit recognized this principle in *Gurrola*, as follows: "In order for the declarant's statements to be admissible, the wrongdoer must 'have in mind the particular purpose of making the witness unavailable.'" *Gurrola*, 898 F.3d at 534 (quoting *Giles*, 554 U.S. at 367).  Indeed, in discussing the common-law forfeiture-by-wrongdoing doctrine, the *Giles* Court recognized that "[t]he terms used to

---

[13] "In interpreting the Mississippi Rules of Evidence, it is appropriate to look to federal law interpreting the Federal Rules of Evidence for guidance." *Portis v. State*, 245 So. 3d 457, 470 (¶31) (Miss. 2018).

define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct designed to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis omitted).

¶48. Based upon our review of the record from the admissibility hearing, we find that the State put forth no evidence at the hearing that showed that McClung "ha[d] in mind the particular purpose of making [Keys] unavailable." *Id.* at 367. Sergeant Bankston, who was the investigator on the Keys murder case, testified at the hearing that she had no evidence of McClung being involved in Keys's murder. He was not developed as a suspect.

¶49. Nor do we find any evidence in the record that McClung "acquiesced" in Keys's murder. In *United States v. Marchesano*, 67 M.J. 535, 543-45 (A. Ct. Crim. App. 2008), the court examined the meaning of "acquiesced" in the forfeiture-by-wrongdoing context. Although the court acknowledged that "tacit assent" or "tacit acceptance" could constitute "acquiescence," it found no evidence that the defendant tacitly or otherwise procured his daughter's absence as a witness at his trial. *Id.* at 544-45. The court concluded that the military judge erred in determining that the accused "acquiesced" in his wife's refusal to honor a subpoena for their daughter's court appearance where the accused simply left the decision whether to produce their daughter for trial with his wife and made no attempt to influence her decision. *Id.* at 545. We likewise find in this case there is no evidence that McClung tacitly assented to or accepted any action on anyone's part to prevent Keys from testifying.

## B. The Conspiratorial Responsibility Theory

20

¶50. The State asserts that McClung is liable for "acquiescing" in procuring Keys's unavailability under the conspiratorial responsibility theory announced in the 2000 decision of *United States v. Cherry*, 217 F.3d 811 (10th Cir. 2000).[14] For the reasons addressed below, we find no merit in this assertion.

¶51. *Cherry* involved five defendants charged with involvement in a drug conspiracy. *Id.* at 813. Much of the State's evidence was from a cooperating witness, Lurks. *Id.* Prior to trial, one of the alleged drug co-conspirators, Price, murdered Lurks. *Id.* The trial court granted the other co-conspirators' motion to suppress Lurks's statement against them, finding that there was insufficient evidence as to one defendant that she "procured Lurks's absence"; and finding as to the other three defendants that there was no evidence that these defendants "had actual knowledge of, agreed to[,] or participated in [Lurks's] murder." *Id.* at 814.

¶52. In relevant part, the Tenth Circuit reversed and remanded to the district court for findings on the following issue: "[W]as . . . Price's murder of Lurks within the scope, in furtherance, and reasonably foreseeable as a necessary or natural consequence, of an ongoing drug distribution conspiracy involving the defendants?" *Id.* at 822. Elaborating on this issue, the Tenth Circuit held:

> [T]oday we hold that participation in an ongoing drug conspiracy may constitute a waiver of constitutional confrontation rights if the following additional circumstances are present: the wrongdoing leading to the unavailability of the witness was in furtherance of and within the scope of the

---

[14] In particular, the State asserts there was sufficient evidence presented at the admissibility hearing to allow the trial court to infer that Holland, with Buchanan's assistance, killed Keys for the purpose of preventing him from testifying at trial, *e.g., supra* ¶38 (discussing Holland and Buchanan), and that under the conspiratorial responsibility theory McClung "acquiesced" in procuring Keys's unavailability.

21

drug conspiracy, and such wrongdoing was reasonably foreseeable as a "necessary or natural" consequence of the conspiracy.

*Id.* at 821 (emphasis omitted). The Tenth Circuit also clarified that "the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice." *Id.*

¶53. In sum, with respect to the drug conspiracy at issue in that case, the *Cherry* court held that "[a] defendant may be deemed to have waived his or her Confrontation Clause rights (and, a fortiori, hearsay objections) if a preponderance of the evidence establishes [that] . . . the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy . . . ." *Id.* at 820.

¶54. Two years later in *Thompson*, the Seventh Circuit Court of Appeals addressed the *Cherry* conspiratorial responsibility test and explicitly recognized the importance of the "reasonably foreseeable" factor. *Thompson*, 286 F.3d at 964-65. The court explained, "By limiting coconspirator waiver-by-misconduct to those acts that were reasonably foreseeable to each individual defendant, the rule captures only those conspirators that actually acquiesced either explicitly or implicitly to the misconduct." *Id.* at 965.

¶55. Finally, in 2008, the Supreme Court decided *Giles*, as we have discussed above, and made clear that in order to apply the forfeiture-by-wrongdoing doctrine there must be a showing of intent to prevent the witness from testifying. *Giles*, 554 U.S. at 361-62. In *United States v. Dinkins*, 691 F.3d 358, 385-86 (4th Cir. 2012), the Fourth Circuit Court of Appeals addressed the *Cherry* conspiratorial responsibility theory in the light of the Supreme

Court's "intent" requirement under *Giles*. In this regard, the Fourth Circuit held that in applying the *Cherry* test, which requires a determination that the wrongful procurement of a witness must be "in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy," *Cherry*, 217 F.3d at 820, the court's decision must be supported by evidence that the defendant "'engaged in conduct *designed* to prevent the witness from testifying.'" *Dinkins*, 691 F.3d at 385 (emphasis in original) (quoting *Giles*, 554 U.S. at 359)). As noted above, no Mississippi appellate court has addressed this issue.

¶56.　Applying these cases, and comparing McClung's case with the facts in *Dinkins*, we find that the State did not demonstrate that McClung engaged in conduct "designed to prevent [Keys] from testifying" or that Keys's murder was reasonably foreseeable to McClung. Accordingly, we find that the trial court erred in admitting Keys's statement against McClung at trial.

¶57.　In *Dinkins*, 691 F.3d at 385, the record reflected that Dinkins was a member of a narcotics trafficking organization called "Special." Dinkins asserted that statements by Dowery, a government informant killed before Dinkins's trial, were wrongfully used against him at trial because Dinkins did not participate in Dowery's murder—Dinkins was in jail at the time. *Id.* at 383-84.

¶58.　The court found no merit in Dinkins's argument, pointing out that the record showed that Dowery was a known government informant and that Dinkins and a co-conspirator, West, had attempted to kill Dowery in October 2004, about a year before Dowery was

23

actually murdered. *Id.* at 385-86. The Fourth Circuit also observed that the record showed that when Dinkins learned that Dowery had not died of his wounds in October 2004, Dinkins said that he and West needed "to go to the hospital to finish him off." *Id.* at 385. Under these circumstances, the court held that the trial court properly admitted Dowery's statements against Dinkins because "the evidence showed that the murder of Dowery in November 2006 was in furtherance, within the scope, and reasonably foreseeable as a natural consequence of an ongoing conspiracy of which Dinkins was a member." *Id.*

¶59. There is no such incriminating evidence in McClung's case. To the contrary, we find that the State did not present sufficient evidence that McClung conspired with any other defendant to kill Keys or that Keys's death was foreseeable to McClung. To the extent that McClung was a part of the shooting incident, the State made no showing that any conspiracy to do so, and involving McClung, continued as far as McClung's involvement or acquiescence in killing Keys. *See Thompson*, 286 F.3d at 965 ("By limiting coconspirator waiver-by-misconduct to those acts that were reasonably foreseeable to each individual defendant, the [conspiratorial responsibility] rule captures only those conspirators that actually acquiesced either explicitly or implicitly to the misconduct."). Sergeant Bankston testified that McClung was not present the night Keys was killed, nor was McClung developed as a suspect in the Keys murder. Indeed, Keys's murder occurred one and a half years after the shooting and from the time when Keys gave his statement. There also is no evidence in the record of any communication between McClung and Holland or McClung and Buchanan (both suspects in Keys's killing)—either before or after Keys was shot.

24

¶60. Based upon our de novo review of the record and the applicable law, we conclude that the trial court erred in admitting Keys's statement against McClung based upon the forfeiture-by-wrongdoing doctrine. We reverse McClung's convictions and sentences and remand for a new trial for this reason and the additional reason addressed in the following section.

## II. Motion for Severance

¶61. McClung also asserts that the trial court erred in failing to sever his trial from the other defendants. In the light of our finding that Keys's statement should not have been admitted against McClung, we agree. Regarding severance of trials, Uniform County and Circuit Court Rule 9.03, which applied when McClung was tried in May 2017,[15] provides as follows:

> The granting or refusing of severance of defendants in cases not involving the death penalty shall be in the discretion of the trial judge. The court may, on motion of the state or defendant, grant a severance of offenses whenever:
>
> 1. If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense . . . .

We therefore review the trial court's refusal to grant a motion for severance for an abuse of discretion. *King v. State*, 857 So. 2d 702, 716 (¶19) (Miss. 2003). In reviewing the denial of a motion for severance, we consider two criteria: "(1) whether the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant and (2) whether the balance of the evidence introduced at trial tends to go more to the guilt of one

---

[15] The Mississippi Rules of Criminal Procedure did not become effective until July 1, 2017.

25

defendant rather than the other." *Hayes v. State*, 168 So. 3d 1065, 1074 (¶34) (Miss. Ct. App. 2013) (internal quotation marks omitted) (quoting *Hawkins v State*, 538 So. 2d 1204, 1207 (Miss. 1989)). McClung must also show that he was prejudiced by the trial court's refusal to grant his motion for severance in order for this Court to reverse and remand his case for a new trial. *See id.*

¶62. In this case, the balance of the evidence introduced at trial weighed far heavier to the guilt of other co-defendants than McClung—indeed, as addressed above, Keys's statement should not have been admitted against McClung at all, absent a showing that McClung acted or acquiesced in Keys's killing or that it was foreseeable to McClung. Upon review of the record and applying controlling law, we conclude that McClung was plainly prejudiced by the trial court's denial of his motion for severance. Accordingly, we find that the trial court abused its discretion in denying McClung's motion for severance, and we reverse McClung's convictions and sentences and remand for a new trial for this additional reason.

¶63. Because we find that the trial court erred in admitting Keys's statement against McClung and in denying McClung's motion for severance, we reverse and remand on these grounds.

### III. Sufficiency of the Evidence

¶64. McClung also asserts that his aggravated-assault convictions should be reversed and rendered because the State presented insufficient evidence supporting his convictions.[16] We

---

[16] We address McClung's sufficiency-of-the-evidence argument in the light of *Newell v. State*, 175 So. 3d 1260 (Miss. 2015), a case in which the Mississippi Supreme Court explained that a challenge to the sufficiency of the evidence should be addressed on appeal even when the appellate court determines that reversal and remand is warranted based upon

may consider the erroneously admitted evidence (i.e., Keys's statement) in addressing McClung's sufficiency-of-the-evidence argument. *See Lockhart v. Nelson*, 488 U.S. 33, 40 (1988); *accord Hilliard v. State*, 950 So. 2d 224, 230 (¶28) (Miss. Ct. App. 2007). Taking into account Keys's statement and the other evidence against McClung presented at trial, we find that the State presented sufficient evidence to sustain McClung's aggravated-assault convictions. We find, therefore, that the proper procedure is to reverse and remand under these circumstances.[17] *Lockhart*, 488 U.S. at 40 (holding that the Double Jeopardy Clause

an evidentiary error in the trial court because there is potential to render a judgment of acquittal. *Id.* at 1267 (¶5).

[17] Judge McDonald asserts in her dissent that without Keys's statement, the remaining evidence against McClung is insufficient to support his convictions of aggravated assault, and, therefore, his case should be reversed and rendered, rather than remanded. Contrary to this assertion, even if there arguably remains no evidence, or insufficient evidence, to support McClung's convictions, the proper procedure is to reverse and remand in this case where a trial evidentiary error is involved, as the Mississippi Supreme Court first explained in *Witherspoon v. State, (ex rel. West)*, 138 Miss. 310, 103 So. 134, 139 (1925), as follows:

> The record simply presents a case wherein a fact necessary to support the judgment rendered was proven or made to appear by incompetent evidence, and in such a case the Supreme Court on appeal thereto should *not decide the case as if no evidence of the fact had been introduced, but should remand the case for a new trial so that the fact may be made to appear by competent evidence.* This, in so far as we are aware, is the universal rule.

(emphasis added); *accord Campbell v. State*, 798 So. 2d 524, 530 (¶22) (Miss. 2001) (reversing and remanding defendant's conviction when defendant's statement to the authorities and evidence of blood on his clothes were found inadmissible and remaining admissible evidence offered at trial was insufficient to sustain the conviction); *Gavin v. State*, 785 So. 2d 1088, 1095 (¶28) (Miss. Ct. App. 2001) (recognizing that "[e]ven when the only evidence on an issue has been declared inadmissible, the proper procedure is to remand"). *See Lockhart*, 488 U.S. at 40; *United States v. Sarmiento-Perez*, 667 F.2d 1239, 1240 (5th Cir.1982) (remanding where a co-conspirator's confession was improperly admitted against defendant; explaining that remand was proper "[b]ecause we cannot know what evidence might have been offered if the evidence improperly admitted had been

allows re-trial when a reviewing court determines that a conviction must be reversed because evidence was erroneously admitted against defendant, even when, without the inadmissible evidence, there was insufficient evidence to support a conviction); *Hilliard*, 950 So. 2d at 230 (¶28) ("We find that, discounting the inadmissible evidence, there was quite meager evidence to sustain [defendant's] conviction. However, all the evidence admitted at trial was sufficient to sustain [it]. . . . Where we, on review, find the circumstances as we do, the proper result is to reverse and remand.").

¶65.    The record reflects that the State showed that on the night of the shooting McClung was at Holland's house with Holland, Jones, Keys, and Buchanan, and that the Loves had recently "gotten" one of their friends. According to Keys's statement, Jones had stated a few days earlier that he needed to get one of the Loves because of this incident. The group left Holland's house in Keys's Tahoe to go to a club. Keys said in his statement that Jones was armed, but that he (Keys) did not know it at the time. However, Keys also said in his statement that it was not unusual for Jones to have his gun because Jones "always" carried his short AK-47. At trial, two of the surviving victims testified that Holland was also armed that evening.

¶66.    The proof established at trial that as the group was traveling on Highway 82, they encountered the Loves. In his statement, Keys said that Jones spotted the Loves in the red Pontiac, and Jones called out that it looked like the Loves in that car. According to Keys, Jones then opened fire on the Love vehicle as they passed by. Testimony from two of the

---

originally excluded by the trial judge").

28

surviving victims at trial also elaborated on the circumstances surrounding the shooting. Stigler and Perez Love both testified that the Tahoe pulled up beside them (the Loves in the red Pontiac) and that both Jones and Holland began shooting. Stigler also testified that "[t]hey bumped us into the ditch. . . . They hit the back end of our car . . . so once they bumped the car we couldn't do nothing but go over in the field and roll."

¶67.    The evidence at trial also showed that after the shooting, McClung made no attempt to leave the group. Holland made arrangements to swap the Tahoe out for another vehicle, he told the group that he had done so, and the group traveled to Moorhead, Mississippi where they swapped vehicles. The group then took backroads to a Best Western hotel in Greenwood, and Keys, Buchanan, Jones, and McClung spent the night together in a room that the evidence showed was rented by McClung.

¶68.    Under Mississippi law, "a person who acts in 'confederation' with others to violate a law is liable as a principal under either the theory of conspiracy or the theory of aiding and abetting." *Adams v. State*, 726 So. 2d 1275, 1279 (¶11) (Miss. Ct. App. 1998) (quoting *Shedd v. State*, 228 Miss. 381, 386, 87 So. 2d 898, 899 (1956)). As such, McClung need not be identified as a shooter to be found liable. Admittedly, discounting Keys's statement, "there was quite meager evidence" sustaining McClung's convictions. *Hilliard*, 950 So. 2d at 230 (¶28). As we found in *Hilliard*, however, we likewise find in this case that, nevertheless, "all the evidence admitted at trial was sufficient to sustain [McClung's] convictions[,] . . . [and, therefore,] "the proper result is to reverse and remand . . . based upon the improper admission of Keys's statement against McClung at trial, as addressed above.

29

*Id.*

**¶69.   REVERSED AND REMANDED.**

**BARNES, C.J., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR.   WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.   J. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.   McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.**

**J. WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶70.   I agree that the admission of Keys's statement violated McClung's rights under the Confrontation Clause.  However, rather than remanding for a new trial, I would render a judgment of acquittal in favor of McClung on the remaining counts because the evidence presented was insufficient to convict him of aggravated assault.

¶71.   When we address a challenge to the sufficiency of the evidence, all credible evidence of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn therefrom. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018).  We consider the evidence in the light most favorable to the State, although we also keep in mind that the State must prove the defendant's guilt beyond a reasonable doubt. *Id.*  This burden must be satisfied with evidence, not speculation or conjecture. *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974).  We will reverse and render if the facts and inferences point in favor of the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt. *Haynes*, 250 So. 3d at 1244 (¶6).  But we will affirm the conviction if "any rational trier of fact could have found the essential

30

elements of the crime beyond a reasonable doubt." *Id.* (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

¶72.    There is no evidence that McClung fired a gun into the red Pontiac, but the State argues that he aided and abetted Jones and Holland. "One who aids and abets another in the commission of a crime is guilty as a principal." *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008). "To aid and abet the commission of a felony, one must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime or participate in the design of the felony." *Id.* (quotation marks, ellipsis, and brackets omitted). We do "not recognize guilt by association." *Id.* "Mere presence, even with the intent of assisting in the crime, is insufficient unless the intention to assist was in some way communicated to the principal." *Id.* (quotation marks and brackets omitted). Likewise, mere presence "at the commission of a crime without taking any steps to prevent it does not alone indicate such participation or combination in the wrong done as to show criminal liability." *Id.* This is true even if the defendant approves of the criminal act. *Id.*

¶73.    None of the eyewitnesses identified McClung as a passenger in the Tahoe. The only evidence against him was Keys's statement.[18] However, during his approximately forty-three-minute recorded statement, Keys said little about McClung and nothing to implicate him as an aider and abettor in the shooting. Keys stated only that McClung was in the back seat of the Tahoe when the shooting occurred and that McClung got a room for the group at

---

[18] The U.S. Supreme Court has held that a reviewing court may consider erroneously admitted evidence when ruling on a challenge to the sufficiency of the evidence. *Lockhart v. Nelson*, 488 U.S. 33, 40 (1988); *accord Hillard v. State*, 950 So. 2d 224, 230 (¶28) (Miss. Ct. App. 2007).

a hotel in Greenwood about three hours after the shooting. Keys stated that there was no discussion about shooting or seeking revenge against the Loves before the group left Holland's house that night en route to a lingerie party. Keys denied that he knew about any plan to attack the Loves or knew the Loves would be on the highway in the Pontiac. Keys claimed that he was shocked when Jones raised his gun and began shooting at the Pontiac. According to Keys, "days prior" to the shooting Jones had said that he needed to get the Loves because they had shot a friend of Keys and Jones. The majority cites this prior conversation as if it is evidence against McClung. *Ante* at ¶65. But there is *no evidence* that McClung was a party to that prior conversation or knew anything of Jones's or Holland's intentions. Keys stated that immediately after the shooting Holland made arrangements to switch cars in Moorhead. And after the group arrived at the hotel in Greenwood, Jones and Holland left alone, apparently to get rid of their guns. Keys, McClung, and Buchanan spent the night at the hotel and called a friend to pick them up in the morning. At the time of his interview, Keys had not spoken to Buchanan or McClung since the morning after the shooting.

¶74. Even with Keys's improperly admitted statement, *see supra* n.18, the evidence is insufficient to sustain McClung's conviction because it establishes only his presence at the scene of the crime. McClung's rental of a hotel room three hours after the shooting is not sufficient to prove, beyond a reasonable doubt, that he encouraged or assisted Jones or Holland prior to or during the commission of their offense. McClung's rental of the room might have supported charging him as an accessory *after* the fact. *See* Miss. Code Ann. §

32

97-1-5 (Rev. 2014); *Harris v. State*, 290 So. 2d 924, 925-26 (Miss. 1974). However, McClung was indicted only as a principal/aider and abettor. *See Hall v. State*, 127 So. 3d 202, 204 (¶7) (Miss. 2013) ("[A]ccessory after the fact is a distinct crime for which a person cannot be punished unless indicted." (quotation marks omitted)). Just because McClung got a hotel room hours after the crime, we cannot assume that he provided some unknown form of encouragement or assistance prior to or during the crime. That is not a reasonable inference based on the evidence but mere speculation and conjecture.

¶75. In addition, the mere fact that McClung "made no attempt to leave the group" after the shooting, *ante* at ¶67, is insufficient to establish, beyond a reasonable doubt, that he encouraged or assisted Jones or Holland prior to or during the shooting. As noted above, mere presence at a crime does not support a conviction for aiding and abetting—even if the defendant took no steps to prevent the crime and actually approved of the crime. *Hughes*, 983 So. 2d at 276 (¶14). It follows that McClung cannot be convicted of aiding and abetting just because he did not quickly disassociate himself from Jones and Holland after he witnessed them open fire on the Loves. An "attempt to leave" a murderous group can be a risky proposition. It would be speculation and conjecture to say that McClung must have somehow encouraged or assisted in the crime just because he "made no attempt to leave" afterward.

¶76. There is nothing else in Keys's statement to show that McClung participated in or knew about any plan to attack the Loves. Nor is there any evidence that he encouraged or assisted Jones or Holland in the shooting. To find McClung guilty as an aider and abettor

33

in the shooting, the jury had to find, beyond a reasonable doubt, that McClung actually aided, counseled, or encouraged Jones or Holland in the commission of the crime. *Jones v. State*, 710 So. 2d 870, 874 (¶15) (Miss. 1998). There is no evidence to support such a finding. Keys's statement proves only that McClung was present in the Tahoe, which is insufficient to sustain the conviction. *Hughes*, 983 So. at 276 (¶14).

¶77. Tellingly, the majority opinion does not even hazard a guess as to what type of assistance or encouragement McClung might have provided to Jones or Holland. The majority simply holds that there is sufficient evidence to establish, beyond a reasonable doubt, that McClung aided and abetted them in some unknown and unspecified way. Such a conclusion requires far too much speculation to support a criminal conviction. Therefore, I would render a judgment of acquittal in favor of McClung on the remaining counts against him. I respectfully concur in part and dissent in part.

**McDONALD, J., JOINS THIS OPINION.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶78. I agree and concur with the majority's analysis of this case and in its conclusion that McClung's conviction should be reversed; I only disagree with the majority's remand of the case. I would both reverse and render.

¶79. With the severance of McClung's case and the proper exclusion of the videotaped statement of Jacarious Keys, the only connection McClung has with this case is the fact that he rented a room at the Best Western hotel that night. Jasmine Cage, who saw the Tahoe pass her with an interior light on, testified that McClung was not in the car when shots were

34

fired at the Love vehicle. None of the surviving occupants of the Love vehicle—Kelsey Jennings, Ken-Norris Stigler, and Perez Love—identified McClung as a passenger in the Tahoe either. In an interview at UMMC the next day, Perez named David Reedy, Armond Jones, Michael Holland and Keys as occupants in the vehicle that had pulled up next to them and was shooting at them. At trial, Perez and Stigler testified that Jones was in the front seat shooting an AK-47, and Holland was in the back seat shooting a pistol. Neither mentioned seeing McClung. Jennings testified that he did not see the vehicle that came alongside them and started shooting, so he could not testify as to the occupants.

¶80. The only testimony connecting McClung to this case is Detective Stanton's testimony that McClung had rented a room at the Best Western hotel that night.

> Q. . . . But your investigation showed that James McClung, he rented the room, correct?
>
> A. Correct.
>
> Q. He rented the room on August 15th. Yes?
>
> A. Yes.
>
> Q. And he checked out on August 16th, correct?
>
> A. Well, I really don't know what time he checked out, but it was rented for one night, I believe.
>
> Q. And you had an opportunity to look at a video from the Best Western?
>
> A. I did examine the video footage from the Best Western.
>
> Q. And when you looked at the video, you didn't see Sedrick Buchanan in the video, did you?
>
> A. The only person that I saw on the video was James McClung when he

35

came in to register for the room and when he went to the room and left the room from the interior portion. Of course, there are blind spots in the system, and that's all we saw.

So there was no evidence that McClung was there that night with Keys, Holland, Buchanan, or Jones:

> Q. With regard to Keys' statement that they went back to the Best Western, you were not able to verify that all of them were there at that time in and around the shooting, am I correct?
>
> A. I could not conclude or rule out where they reentered that room that night or that morning at all.
>
> Q. In fact, you have no evidence of them being there at all together during this time, the renting of the room or thereafter, correct?
>
> A. Other than the statement of Jacarius Keys, no.

Moreover, on cross-examination, Staten admitted that McClung had frequently rented rooms at the Best Western and was actually found at the Best Western when he was arrested for this charge.

¶81.   With the exclusion of Keys's statement, the remaining evidence against McClung is insufficient to support his convictions of aggravated assault in this case.

> In evaluating the sufficiency of the evidence, this Court must decide whether it allows a jury to find beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.

*Ringer v. State*, 203 So. 3d 794, 796 (¶3) (Miss. Ct. App. 2016) (internal citation mark omitted).   The elements of aggravated assault are found in Mississippi Code Annotated section 97-3-7(2)(a) (Rev. 2014):

36

> A person is guilty of aggravated assault if he or she (i) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (iii) causes any injury to a child who is in the process of boarding or exiting a school bus in the course of a violation of Section 63-3-615 . . . .

Here, there is no proof that McClung attempted to cause or purposely caused bodily injury to any of the people riding in the Love vehicle that night even if the evidence is weighed in the light most favorable to the jury's verdict. Consequently, the case not only needs to be reversed; it needs also to be rendered. "Reversals based upon a finding that the verdict is against the overwhelming weight of the evidence result in remand for new trial. Reversals due to trial error also result in remand. Reversals based upon a finding that the evidence is insufficient to support the verdict, however, are not remanded but are rendered." *Moore v. State*, 755 So. 2d 1276, 1280 (¶15) (Miss. Ct. App. 2000). It would be a waste of judicial resources and would put an unnecessary financial and psychological burden on McClung to try the case against him again. Accordingly, I would reverse McClung's conviction and render judgment in his favor.

**WESTBROOKS, J., JOINS THIS OPINION.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶82. Because I believe that the multiple tests implemented today regarding forfeiture by wrongdoing are unnecessarily complex, I respectfully dissent in part. We should strive to provide clarity to the Bench and Bar in how to implement the Mississippi Rules of Evidence. This is especially so because "[t]rials are often chaotic and sometimes intensely adversarial,"

37

and we need the Rules "to bring order and fair play to the trial process." *Richards v. State*, No. 2017-KA-00809-COA, 2019 WL 1771923, at *4 (¶18) (Miss. Ct. App. Apr. 23, 2019). We need tests and rules that can be applied in the chaotic arena of trial.

¶83. The majority cites to various decisions from the U.S. Supreme Court, the Fourth Circuit, the Fifth Circuit, the Tenth Circuit, and the Army Court of Criminal Appeals.[19] Not only do we adopt a new interpretation of a rule we have never previously analyzed, but we also adopt a *new sub-test*, on the "conspiratorial responsibility theory." I am greatly reluctant to find the State was in error under the boundaries of the law as it was known at trial after we have traveled so far to find reasons for error. I also think this interpretation does not provide the clarity needed for a clear application of the Rule.

¶84. The better path would be to confine ourselves to the plain language of the rule and whether the exception was or was not met. More precisely, we should confine ourselves to whether *the trial court* was within its discretion in finding that Rule 804(b)(6) was met.

---

[19] I believe the sprawl of the majority opinion into federal cases is also unnecessary for purposes of placing our own interpretation of our own Rules at the forefront. In 1985 the Mississippi Supreme Court adopted the Rules of Evidence, and those Rules were implemented by the Court itself, under power vested by the Mississippi Constitution of 1890. *See* M.R.E. Adopting Order (Miss. Jan. 1, 1986); *Newell v. State*, 308 So. 2d 71, 76 (Miss. 1975) ("The inherent power of this Court to promulgate procedural rules emanates from the fundamental constitutional concept of the separation of powers and the vesting of judicial powers in the courts.").

In contrast, the Federal Rules of Evidence were written and adopted by Congress as a statutory codification of evidentiary rules for the federal court system. *See Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 587 (1993). So our rules are written by our State Judiciary and interpreted as seen fit; the Federal rules are written by its Legislature and required to be interpreted as any other statute. At root, there are simply different issues facing the federal courts and different modes of interpretation. I vastly prefer us developing our own interpretation of our own Rules and not "lockstepping" with the Federal Judiciary.

¶85.    The majority is correct that we must reverse McClung's convictions because the motion for severance should have been granted.  However, I respectfully dissent from its digression regarding the admission of Keys' statement and its decision to reverse the conviction on that evidentiary ruling.

**WESTBROOKS, J., JOINS THIS OPINION.**